Opinion delivered June 27, 1888.

No. 6094.

R. W. LEDBETTER *v.* THE STATE.

1. JUSTIFIABLE HOMICIDE IN DEFENSE OF PROPERTY—CHARGE OF THE COURT.—The first of two rules deducible from the statutes (Penal Code, arts. 572, 575). defining justifiable homicide in the defense of property, may be stated as follows: If the attack upon the property is such as to produce in the mind of the owner (or person interfering) a reasonable apprehension or fear of death or serious bodily harm to the owner or

person interfering, either may act at once, without resorting to other means to prevent the attack or protect the property. But if the property of the owner is attacked, and not in such manner as to endanger life, etc., every effort must be made to repel the aggression in order to justify the homicide. See the opinion for a charge of the court upon the doctrine *held* sufficient.

2. SAME.—But if, as in this case, the deceased undertook to seize and take the property of the accused in an unlawful manner, and in so doing aroused the passion of the accused to such an extent as to render his mind incapable of cool reflection, and to rebut the presumption of malice, the killing would be manslaughter only, though the accused did not resort to all other means to prevent the seizure of the property. Note that the charge of the court does not submit this phase of case, though made by the proof, wherefore it is insufficient and erroneous.

3. MURDER OF THE FIRST DEGREE— FACT CASE.—See the statement of the case for evidence *held* insufficient to support a conviction for murder of the first degree.

APPEAL from the District Court of Falls. Tried below before the Hon. Eugene Williams.

This is the second appeal prosecuted by this appellant from a conviction in the first degree for the murder of D. P. Rice, in Falls county, Texas, on the fifth day of August, 1886. The penalty assessed on this trial was a life term in the penitentiary.

The first trial will be found reported in the twenty-third volume of these Reports, beginning on page 247. A re-statement of the case, however, is deemed necessary, in view of the material variance in the testimony on the two trials, and the ruling of this court on this appeal directly involving the evidence.

Robert Franz was the first witness introduced by the State. He testified that he lived at Moffatt at the the time of the killing of Rice by the defendant, which killing occurred on the fifth day of August, 1886. Rice was then constable of the Moffatt precinct, and defendant was a farmer living in the neighborhood. About a month before the tragedy the deceased executed an attachment upon a yoke of oxen belonging to, or then being in the possession of, the defendant. Defendant came to witness's shop and requested him to go on his replevin bond for the oxen, and at that time remarked to witness, in the presence of Mr. Moncus, that if Rice ever arrested or came after him again he, defendant, would kill him.

Ike Hubbard testified, for the State, that some time before the killing of Rice, he, Rice, placed in the hands of the witness

a yoke of oxen which he had seized in the hands of defendant by attachment. Afterward, and while the oxen were in the possession of the witness, the defendant, talking to witness about the deceased, said: "If the little slick faced rascal ever fools with me or attempts to arrest me, I will kill him." This was some months before the killing, when the oxen were attached at the suit of Mr. Field. This remark was made to witness at witness's gate, no person other than witness and defendant being present. Subsequently defendant made substantially the same threat at Ike Warren's house, Ike Warren being present. Witness denied that on the previous trial of this case he testified that Ike Warren was present and heard the threat when made the first time. Witness said nothing about the second threat on the first trial because he did not think about it, and was not asked about it. Ike Warren testified that on one occasion while the oxen were under attachment, and were being held by Ike Hubbard and himself for the deceased, he heard the defendant say that if the deceased ever bothered him again he would kill the deceased. He did not say that if Rice ever attempted to arrest or attach him he would kill him. Hubbard and deceased were present when defendant recovered his oxen from that attachment, and witness once before, while the oxen were under attachment, saw defendant and deceased together. He heard no angry or cross words between them on either occasion.

James Pettigrew testified, for the State, that about three weeks before the killing of Rice, he met the defendant in the road, not far from the houses of him, the witness, and Rice and Morris. Defendant, who was armed with an army gun, asked witness if "that d—d stink, Darwin Rice, was at home?" Witness replied that he supposed Rice was somewhere about. Defendant then said that he would not die contented unless he killed Rice. Four or five days later he came to witness's house hunting Mr. Norris, and made about the same remark about Rice, and said about the same thing about Justice of the Peace Sykes, who presided at the trial of the case between Mr. Fields and defendant, which suit involved the oxen seized by attachment. Defendant claimed that Mr. Sykes did not award him justice on that trial. Sykes was then paralyzed, and traveled and moved about in an invalid chair. Cross examined, the witness said that he told nothing about the second threat on the former trial because he was not asked about it. The

witness only knew the defendant by sight, and as defendant, when he met witness on the road, asked witness his name, witness supposed that defendant did not then know who he was.

J. W. Norris testified, for the State, in substance that the defendant lived with him for six or eight weeks in the spring of 1886. In February of that year Mr. Fields seized one yoke of the defendant's oxen by attachment. Defendant came to witness and asked a loan of one hundred dollars with which to discharge his debt to Fields and recover his oxen. Witness did not at first agree to advance the money to the defendant, but a few days later Fields told witness that if he (witness) would pay him fifty dollars, and half the costs of court standing against the litigation between him and defendant, he would release the oxen to the defendant, and cancel his demand. Witness agreed to do so if defendant would secure him by mortgage on a yoke of oxen and his sulky plow. Fields went off and soon returned and informed witness that he did not find defendant, but saw 'Squire Sykes, who told him that the half of the costs standing against the litigation was thirteen dollars and fifteen cents, and that he (Sykes) would advise witness to take the mortgage on both of the yokes of oxen and the plow belonging to defendant. Defendant afterwards consented to the proposal of Fields. Witness paid the debt and costs. amounting to sixty-three dollars and fifteen cents, and defendant gave him a mortgage on one yoke of the oxen and the plow, agreeing at the same time to redeem the property covered by the mortgage by breaking prairie land for the witness at three dollars per acre, boarding himself and feeding both yoke of oxen. Accordingly, he went to work for the witness on February 20, 1886, worked about four weeks, and left without a settlement, and leaving both yoke of oxen and the plow at witness's house.

About two weeks later the defendant and Calvin Newsom came to the witness's house. Newsom came in and talked some time with the witness. Defendant then came in and asked witness where his oxen were. Witness replied that they were in the granary, locked up, and that he could not get them. He then began to abuse witness, said that he would have them. and seized a stone which he held in a position to throw at the witness. Witness then seized an iron coulter, when Newsom told the defendant that he was at the wrong place. Defendant then dropped the stone, and he and witness sat down, and, in

the presence of Newsom, had a settlement. Witness told defendant that his (witness's) claim against the mortgaged property exceeded forty dollars, but that he would cancel it for twenty-six dollars. Witness then agreed to surrender one yoke, and did so, the defendant putting it on two of the oxen which he took away, agreeing to return in two weeks, pay the twenty-six dollars, and get the other oxen, yoke, chains, etc. Witness saw no more of the defendant until the fourth day of the succeeding August, when he came to witness's place and without witness's consent seized and took off the yoke of oxen and the plow. When seized, the oxen and plow were on the east side of the field, and the witness on the west side. Witness hallooed to defendant when he started off with the oxen and plow, but defendant paid no attention to him. Witness then mounted his horse, followed and overtook defendant on the road. As witness approached, defendant sprang from his plow and drew his gun on witness. Witness told him to put the gun down, and advanced to his side, when defendant struck him a severe blow on the arm with the gun, and witness left.

Leaving defendant, the witness went immediately to 'Squire Sykes and swore out a complaint against defendant. He then found Rice, the constable, and arranged to go with him on the next morning to find the defendant. On the next morning the witness, his son-in-law, Mr. Boyd, his tenant, Mr. Holbrook, and Rice, met at the school house and went together to the field where the defendant was at work, passing to the left of G. I. Carney's house. Reaching the field in which the defendant was at work, and where, at that time, the defendant was under his plow arranging some part of its mechanism, and hence did not observe their approach, the witness and his party advanced abreast until they reached the plow. Witness rode up to the right side of the off wheel steer, when defendant observed him and came from under the plow and stood up. He then had nothing in his hands. Rice dismounted and threw his bridle rein over the beam of the plow. He then walked towards the defendant, remarking to him: "Keep cool, Mr. Ledbetter; I only want to talk to you." Defendant then began to walk around to the opposite side of his plow, cursing Rice and telling him that he had once before assured him that if he, Rice, ever fooled with him he would kill him, Rice. Defendant got around to the rear of the near wheel steer, and Rice walked around to that side of the plow. Witness then saw that defend-

ant was working or pulling at something attached to his plow. Almost instantly defendant drew his gun from under the plow and fired at Rice. Rice leaned forward as soon as the gun was discharged, and seized it by the barrel. A struggle ensued, which resulted in Rice throwing the defendant to the ground and falling on him. Defendant soon turned Rice, released himself, got up and backed off, and then turned and ran to a point about thirty yards distant. Witness and a young man who came from a hay rack near by then took Rice up, and laid him on some hay a few steps from where he fell. Rice, who then had the defendant's gun, gave it to witness. About the time the witness and the young hay maker, Baird by name, got Rice laid down Baird exclaimed to witness: "Look out!" Turning, the witness saw the defendant advancing upon him rapidly with a drawn knife. Witness reversed the gun to use it as a club, but found his arm too sore from the blow inflicted by the defendant on the day before to be able to do so. Witness then said to defendant: "You have killed Rice; now go away, and let us take care of him." He replied: "I intend to kill the last d—d one of you!" He then started towards witness, and witness threw the gun to the ground in an opposite direction from defendant, and said to him: "Now you have your gun; go away, and let us take care of Rice." He replied: "No; I intend to kill the last d—d one of you, if you don't leave!" He then snapped the unloaded gun at witness, and witness mounted his horse and started off. He looked back and saw defendant put his hand in his pocket, when he started his horse into a trot. When he reached a point about thirty yards distant defendant fired at him, missing him. When witness got off about three hundred yards he looked back and saw defendant get on his plow. Defendant then got off his plow and went to a place where some hay makers were at work, taking his gun with him. Witness then rode forward and joined Boyd and Holbrook.

On his cross examination, the witness stated the account standing between him and defendant as he understood and knew it to be, leaving the defendant over forty dollars in his debt. He stated, however, that the defendant claimed to have discharged his indebtedness. Witness denied that, when the defendant came to his house with Newsom, he, witness, told defendant that if he ever came to his house again he would not leave a grease spot of him. He denied, also, that on that occasion he called the defendant a d—d thief. Defendant did

not, on that occasion, tell witness that he, witness, was trying to steal his oxen. He merely said that he wanted his oxen, and witness told him that he could not get them. If witness testified on the former trial that defendant, when he came to witness's house, called him a d—d thief, and said that he was trying to steal the oxen, he testified to what was not true. Witness failed to testify, on the former trial, about defendant drawing his gun on him on the day that he forcibly took off the oxen and plow, because he was not asked about it. Witness did not, on the former trial, testify that 'Squire Sykes, on the day the complaint was filed, deputized him to arrest defendant, nor was it a fact that Sykes did deputize him. Sykes did not then tell witness that Rice was not at home, and for him to take the warrant and execute it. He gave the warrant to witness and told him to give it to Rice. At this point the witness was confronted with the warrant, showing the deputation of himself and his oath endorsed on the back of the same. Referring to the warrant, the deputation and oath, the witness said that he may have been deputized and sworn, but did not so understand the proceedings. Rice and witness went to the field to arrest and take defendant into custody. Boyd and Holbrook went to take back the oxen and plow.

Witness denied that on the former trial he testified that Boyd and Holbrook did not go up to the plow at the time of the shooting, but stopped within forty yards of it, and that he himself went but twenty yards nearer, and that Rice alone went to the plow where the defendant was. He denied that on said former trial he testified that neither Boyd nor Holbrook could see and hear as well as himself, because they were too far away from the parties. He denied that he testified on that trial that the first thing said by defendant was: "What the hell do you fellows want here?" Such words were not spoken by defendant. Witness declared that on the said former trial he testified that Rice said to defendant: "Keep cool; I only want to talk to you about these oxen," and that defendant replied: "My cattle have got nothing to do with you," and such was the truth. The witness denied that he testified on the former trial that the oxen were standing too much between him and the parties for him to clearly see or know what the parties were doing at the moment the gun fired. As a matter of fact Rice and defendant were standing not more than one or two feet apart, talking, when the gun was discharged, and Rice seized the barrel of the

gun about the time it fired. Witness's feelings towards defend-
ant were not kind. The witness admitted that on the former
trial he testified that his feelings towards defendant were kind,
and that he was not a man to bear malice. He believed his
feelings for defendant were as good now as then. Witness's
reason for now stating that his feelings for defendant were un-
kind, was that the more he thinks of defendant's attempt to
shoot him, the madder he gets.

G. I. Carney testified, for the State, that on the fatal morn-
ing the defendant came to his house and told him that he had
a difficulty with old man Norris the day before, and that he
expected Rice and other officers to attempt his arrest on that
day. He then told witness that if they passed there to tell
them not to go to the field in which he was at work, or at least
to where he was at work, for if they did he would kill them.
He then went off to work, and about ten o'clock witness saw
old man Norris and three other parties going towards the field.
He did not speak to them. Some time afterwards Norris and
two men passed, going back over the route they came. About
fifteen minutes later defendant came to the house and told wit
ness that he had done what he said on that morning that he
would do; that Rice, Norris and others came to the field to ar-
rest him, and that he killed Rice.

F. M. Boyd testified, for the State, that he went with Norris,
Holbrook and Rice to the field in which the killing occurred.
Rice and Norris went to arrest defendant, and witness and
Holbrook to take the oxen and plow back home. Defendant
was under his plow, fixing the share, and did not observe the
approach of the party until the plow was nearly reached. He
then got up with his gun, and said to Rice: "Darwin Rice, what
do you want?" Rice replied: "I came here to see you about
those steers." Defendant then said: "Rice, if you don't leave
here I will kill you!" Rice told him to keep cool; that he wanted
only to talk the matter over with him, and wanted no trouble.
Rice then got down and threw his bridle reins over the beam
of defendant's plow. Defendant pointed the gun at Rice and
told him he would kill him. About that time the gun was
fired and Rice caught it, and a struggle ensued which resulted
in Rice throwing defendant. Defendant soon turned Rice and
released himself, leaving Rice in possession of the gun. Norris
then ran up and got the gun from Rice, when defendant fled to
a point about thirty yards distant. He soon returned with a

knife and got the gun from where it was thrown by Norris. He then ordered the party to leave, which they did. He fired at Norris as the latter rode off. Witness, Norris and Holbrook were in their shirt sleeves, and unarmed. Rice had on a light coat, and was apparently unarmed, but witness had been informed that a pistol was found in his saddle bags, which were on his horse.

Cross examined, the witness said that Rice was in the lead when the party approached the defendant and his plow, and that the parties did not approach riding abreast. They were directly in front of the steers when they were discovered by the defendant. Norris was twenty-five or thirty yards distant from the oxen when the fatal shot was fired, and was further from Rice and defendant than witness and Holbrook were. The witness was in the court house at the first trial of this case, but was not called to the stand. He denied that he told the counsel for the defense, in the old court house, during the first trial, and in the presence of Fennel and others, that he and Holbrook stopped fifty yards from the scene of the shooting, and were too far off to see or hear anything that transpired. Witness saw defendant take a cartridge from his pocket and load his gun, when, in reply to Rice's first remark, he said that he would kill Rice if he did not leave.

Holbrook's testimony differed but slightly and immaterially from the testimony of Boyd. He declared that he and Boyd were about ten steps from the defendant at the time the fatal shot was fired, and that Norris was somewhere behind them, he did know how far. Rice had nothing but a tooth pick in his hand when he was shot. If he had a warrant with him witness did not know it, and Rice said nothing to defendant about arresting him.

The State closed.

The defense recalled Norris for the purpose of laying a predicate upon which to impeach him. He testified that the difference in distance between himself and the defendant, and Boyd and Holbrook and the defendant. at the time of the shooting, was slight. Witness saw no envelope nor paper in Rice's hand at any time during the difficulty, nor did he swear on the former trial of this case that Rice accosted and approached defendant with a paper in his hand which he, witness, then thought was an envelope. Rice said nothing to defendant about arresting him. Witness gave Rice the warrant to arrest the defendant

on the day before the tragedy, but was unable to say whether or not Rice had it with him. He had no process of any sort upon which to take the oxen.

Several witnesses were introduced by the defense to impeach the witness Norris. The substance of their collective testimony was that on the former trial of this case the said Norris testified that Boyd and Holbrook stopped at a point forty yards distant from the oxen and plow, and that he stopped at a point fifteen or twenty yards distant, and was in a better position than theirs to see what occurred and to hear what was said; that the oxen were between him and Rice and defendant at the time of the shooting, and he could not tell what was said or done at that particular point of time; that justice of the peace Sykes deputized him on the day before to execute the warrant because Rice was not at home, but that after leaving Sykes's on that evening he met Rice and gave him the warrant, and went with him next day to execute it, and that Rice, he thought, had an envelope in his hand at the time he was shot.

The substance of the testimony of the witness B. F. Fennel was that he and Boswell, now deceased, were at work on a hay wagon, and witnessed the shooting from a distance of about one hundred and twenty yards. When Rice and his party entered the field gate, Boswell remarked: "Those four men have come to arrest Ledbetter, and we will see some fun." Defendant was working under his plow when Rice reached the plow, Boyd and Holbrook having stopped forty or fifty yards distant from the plow, and Norris about twenty yards distant. Iota Baird, who left his hay rake to observe the arrest, was standing about twenty yards from the plow.

About the time Rice reached the oxen, defendant came from under the plow, bringing his gun with him. Rice dismounted, taking an official envelope from his pocket at the time, and hitched his horse to the beam of the defendant's plow. Witness could then see from the motions of the two men that they were talking, but could distinguish nothing said by either. Defendant held his gun with the breech protruding behind him on the left side, the muzzle pointing down. After talking a moment or two defendant walked backward until he reached the rear of one of the steers, Rice following and evidently talking to him. About that time Rice sprang forward and caught the barrel of the gun five or six inches below the muzzle, and soon afterwards the gun fired. The subsequent part

of the diffculty transpired substantially as related by the witnesses for the State. Soon after Norris left the scene of the shooting the defendant came to the wagon where witness and Boswell were at work, and asked if they saw the tragedy. Witness replied that they were too busy. Defendant then said: "I hated to kill that young man, Rice, as he is related to some of my best friends, but if it had been that old son of a bitch I would not care." He then showed the witness a bleeding scratch on his hand, which he said Rice made in cutting at him with a knife. Witness saw no knife in Rice's hand, nor could he find one about his body when he went to it after defendant left the field.

Boswell's testimony at the former trial was reproduced by an attorney substantially. It concurred with Fennel's, except as to the conversation with Fennel as to the shooting, about which the reproducing witness said nothing. His statement was positive, however, as to the position of the several parties when the fatal shot was fired, and that Rice sprang toward defendant and seized the gun before it was discharged.

The witness Iota Baird testified substantially as did Fennel as to the main facts, except the conversation between Fennel and defendant after the shooting. He located himself somewhat nearer the parties at the time of the shooting than Norris was, and declared that, while he heard the parties talking, he understood but one remark, and that was made by defendant just before Rice sprang forward, to the effect that, "If you run on me I will kill you." This witness could not remember that Rice had or had not an envelope in his hand at any time during the difficulty. When, after the shooting, Norris, in response to defendant's demand, threw down the gun and told defendant to take the gun and leave him and witness to care for Rice, defendant said to Norris: "Now, you leave here, or I will kill you, for you are the cause of Darwin Rice being as sick as he is."

Frank Elliott testified, for the defense, that he was at Fennel's wagon when the killing occurred. He placed the several parties in the positions that Fennel's testimony placed them, and stated that defendant was holding his gun with the muzzle down when Rice sprang forward and caught the barrel of the gun, immediately after which the gun was discharged.

The motion for new trial raised the questions discussed in the opinion.

*P. P. Norwood,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

HURT, JUDGE.  This is a conviction for murder of the first degree, with punishment fixed at confinement in the penitentiary for life.

After submitting to the jury the law of manslaughter and of murder of the first and second degrees, the court charged as follows:  "If you believe that the defendant killed said Rice, then, if from defendant's standpoint it reasonably appeared to the defendant, or if you believe that by the acts or the words coupled with the acts of Rice, that it was Rice's purpose and intent to make an attack on the defendant's property, such as produced in the defendant's mind a reasonable expectation or fear of death or some serious bodily injury, and you believe that such killing took place while Rice was in the act of making such attack, or after some act done by Rice showing to the defendant, from his standpoint, or showing to you, evidently an intent on the part of Rice to make such attack, the defendant would be justified in such killing, and you will find the defendant not guilty.

"If you believe that defendant killed Rice, but that at the time Rice was not making, or about to make, such attack on defendant's property as produced such fear or expectation, yet, if you believe said Rice was making, or was about to make, any other unlawful and violent attack upon the property of the defendant besides such as produced such reasonable expectation, or fear, or if it reasonably appeared to defendant from his standpoint that by the acts, or words coupled with the acts of Rice, that Rice was making, or was about to make such other unlawful and violent attack, and that the defendant killed Rice while Rice was in the very act of making such other unlawful and violent attack, then such killing would be justified in law, and you will find the defendant not guilty. Yet, to find the killing so justified in repelling this character of attack, if any, on his property, such as did not produce a reasonable expectation or fear of death or some serious bodily injury, the defendant must have resorted to all other means for the prevention of the injury except retreat, and every other effort in the defendant's power must have been made by the defend-

ant to·repel the aggression before he would be justified in such killing."

In article 572, Penal Code, it is provided: "Homicide is justifiable also in the protection of the person or property against any other unlawful and violent attack besides those mentioned in the preceding article, and in such case all other means must be resorted to for the prevention of the injury, and the killing must take place while the person killed is in the very act of making such unlawful and violent attack; and any person interfering in such case, in behalf of the party about to be injured, is not justified in killing the aggressor, unless the life or person of the injured party is in peril by reason of such attack upon his property."

Article 575: "When under article 572, a homicide is committed in the protection of property, it must be done under the following circumstances.     *     *     *     Every other effort in his power must have been made by the possessor to repel the aggression before he would be justified in killing."

We deduce from these articles the following rules: ·

If the attack upon the property is such as to produce in the mind of the owner or person interfering, a reasonable apprehension or fear of death or serious bodily harm to the owner or person interfering, either may act at once, without resorting to other means to prevent the attack or protect the property. But, if the property of the owner is attacked not in such manner as to endanger life, etc., every effort must be made to repel the aggression in order to *justify* the homicide. This proposition in substance was given in charge to the jury, following the rule in Lilly v. The State, 20 Texas Ct. App., 1.

But suppose, as is very clearly indicated in this record, it was the purpose of Rice to take the plow and oxen from the accused. Evidently this would have been unlawful, and the attempt to seize the property aroused the passions of the accused to such an extent as to render the mind incapable of cool reflection, to such an extent as to rebut the presumption of malice, the killing would be manslaughter only, though the defendant did not resort to all other means to prevent the seizure of the oxen.

This phase of the case is not submitted to the jury, and though no instructions were requested bearing upon it, still under the facts of this case the omission was clearly calculated

to injure the rights of the appellant, and the judgment should be reversed because of this error.

This is the second appeal, and we have very carefully read the statement of facts on both appeals, and our deliberate conclusion is that this judgment should not stand, because we believe there is no satisfactory proof of murder of the first degree. There are some slight circumstances tending to establish express malice, but when we look to the facts immediately surrounding the homicide, express malice is clearly negatived, and we are not willing that this verdict should stand as a precedent. The judgment is reversed and the cause remanded.

*Reversed and remanded.*