### F. W. HABEL v. THE STATE.

*No. 6721.    Decided March 15.    Rehearing refused April 26.*

1. **Practice—Special Venire.**—It was contended on this appeal that the conviction should be set aside because it did not appear from the transcript that a special *venire* was ever ordered by the court. *Held,* that the contention is not supported by the record. On the contrary, the regularity of the proceedings in the organization of the jury is sufficiently disclosed by the record.

2. **Same—Jury Law.**—Article 3056 of the Revised Statutes prescribes the oath which is required to be administered to the sheriff and his deputies when jurors not selected by the jury commissioners are to be summoned. This requirement of the law is complied with if the said statutory oath is administered to the sheriff and his deputies at the beginning of the term, and need not be repeated on every trial and as often as additional talesmen are to be summoned.

3. **Same—Postponement.**—On this trial the defense objected to the issuance of *venires* for talesmen until certain of the *veniremen* who had been summoned and who were absent had been attached and brought into court to be passed upon, and he asked a postponement of the trial until this could be done. Attachments were awarded, but postponement was denied. *Held,* that the action of the trial court was correct. A defendant can not unreasonably delay a trial because of the absence of jurors who have been summoned. See Hudson's case, *ante,* 323, for discussion of questions arising under this objection.

4. **Mutual Combat—Charge of the Court.**—Instructing with regard to mutual combat entered into where death, or serious bodily injury likely to result in death, might ensue, the court properly charged the jury that in such state of case self-defense would not apply.

5. **Same—Perfect and Imperfect Self-Defense.**—The proof tending to show that the defendant left the house to engage in an affray with the deceased—a misdemeanor under our law—it would have been proper for the court to instruct the jury as to what the law would be if defendant went out to engage in a fisticuff with deceased, but with no intention of engaging in a deadly contest or of using a deadly weapon, and that he did not use a deadly weapon until after the apparent effort of the deceased to use a deadly weapon on him. But in such case the defendant's right of self-defense would not be, as insisted in his behalf, a perfect one, but would be imperfect to the extent of the gravity of the offense which he originally intended to commit. See the opinion for a succinct statement of the rule, and note that the omission in the charge was harmless in view of the finding of the jury.

6. **Practice—Privilege of Counsel.**—The expression of opinion as to the guilt or innocence of the defendant by counsel in argument to the jury is to be reprehended, still a mere violation of the rule is not cause for reversal. In any event the violation of the rule would be immaterial on appeal in the absence of a requested instruction to the jury to disregard the attorney's individual opinion.

7. **Same — Charge of the Court. — The Testimony of a Defendant** in his own behalf stands upon an equality with that of any other witness, and is subject to the comment of opposing counsel. In this case the district attorney criticised harshly

the credibility of defendants as witnesses in their own behalf, and warned the jury that "so long as defendants are to be believed when testifying in their own behalf, no man will ever be convicted in this State." The court instructed that the jury were the exclusive judges of the credibility of the witnesses and of the weight of their testimony, and that if after considering all of the testimony they had a reasonable doubt as to the guilt of the defendant, they should acquit. The rule is that the merely indiscreet declarations of counsel in argument will not operate to reverse a conviction when (as in this case) the effect thereof is neutralized by the charge of the court.

### On Motion for Rehearing.

8. **Murder—Charge of the Court.**—Two rules governing the charge of the court are: 1. The charge must respond to and be limited by the evidence. A charge which has no application to any evidence adduced on the trial is erroneous, is calculated to confuse and mislead the jury, and it is radical error for the court to assume and charge upon a theory not indicated by the evidence. 2. If the error (in the charge), however immaterial it may be, is promptly excepted to, and the exception is perpetuated by proper bill, this court on appeal is required to reverse a conviction, without inquiry as to the effect of the error upon the jury. This court, on original hearing of this appeal, in view of the conviction for manslaughter, declined to review the charge of the court on murder in the first degree. On this motion, however, it is made to appear from the record that the charge on murder in the first degree was excepted to when given, and under the circumstances it is *held*, that the assignment of error based upon the insufficiency of the evidence to raise the issue of murder in the first degree should be considered. But see the statement of the case for the substance of evidence *held* to present murder of the first degree as one of the theories of the State, and see the same for charges of the court on that grade of murder *held* correct and sufficient.

Appeal from one of the District Courts of Dallas. Tried below before Hon. R. E. Burke.

Under an indictment charging him with the murder of Ed Gillette, in Dallas County, Texas, on the 18th day of September, 1889, the appellant was convicted of manslaughter and his punishment was assessed at a term of two years in the penitentiary.

A circumstantial statement of the facts proved on the trial is not essential to this report. The ruling announced in the last head note is the only one in connection with which it is necessary to summarize the evidence. The proof bearing upon the question involved will be found succinctly stated in the brief of counsel for the appellant.

The charges of the court referred to in the last head note read as follows:

"All murder committed by poison, starving, torture, or express malice, or committed in the perpetration or in the attempt at the perpetration of arson, rape, robbery, or burglary, is murder in the first degree; and all murder not of the first degree is murder of the second degree.

"Express malice is when one with a sedate and deliberate mind and formed design unlawfully kills another, which formed design is evidenced by external circumstances discovering that inward intention, as lying in wait, antecedent menaces, former grudges, and concerted schemes to do bodily harm, or other circumstances showing a sedate and deliberate mind and formed design unlawfully to kill, or to inflict serious bodily harm

which might probably end in the death of the person upon whom the same was inflicted.

"Malice aforethought includes all states of mind under which the killing of a person takes place without any cause which will in law justify, excuse, or extenuate the homicide. It is a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from acts committed or words spoken. * * * A sedate and deliberate mind imports that the mind is sufficiently composed, calm, and undisturbed to admit of reflection and consideration on the design, and in a condition to comprehend the nature of the act designed and its probable consequences. Whilst the formed design to kill deceased, or inflict upon him serious bodily harm which would probably result in death, must originate in or result from a sedate and deliberate mind, the law does not and can not define any precise time for the formation of any such design. It may take place in the shortest interval—even the moment before the act, as well as days or months before. In determining whether murder has been committed with express malice or not, the important questions are: Do the facts and circumstances at the time of the killing, before, or after that time, having connection with or relation to it, furnish satisfactory evidence of the existence of a sedate, deliberate mind on the part of the person killing at the time he does the act? Do they show a formed design to take the life of the person killed, or do him serious bodily harm which in its probable consequences may end in his death? If they do, the killing, if it amounts to murder, will be upon express malice."

*D. G. Wooten*, for appellant.—In a case like this, where there is no evidence of any element of such malice as would raise the offense to murder in the first degree, it is a fatal error to charge the jury upon that grade of homicide, and it will be presumed that such charge improperly influenced the jury in arriving at their verdict.

Taking the testimony in this case most strongly against the defendant there can certainly be no reasonable inference or implication of such malice as constituted murder in the first degree. The witness Jennie Clifford testified that Habel and Moody came into the theatre early in the evening and remained there thirty minutes or an hour before the shooting; that Habel had never been there before to her knowledge and had no previous acquaintance with deceased, who was a "beer-jerker" in the theatre; that defendant bought beer from her, paid for it, drank it with her and deceased, and in every way "acted like a gentleman;" that when she came to settle with deceased a dispute arose between him and her and that she called the defendant to verify her statement, which he did; whereupon deceased said "you just step out in the alley and we will settle this matter." Deceased went first and defendant followed.

Deceased had a corkscrew (the one shown in evidence and now attached to the transcript) in his belt that night, and had it there when he went out of the house. The dispute was between witness and deceased, and the defendant had nothing to do with it except he was called in to substantiate the statement of the girl. Deceased demanded what he had to do with it. Defendant replied, "I have got to do what is right about it," and deceased invited him outside to settle the matter, and himself rushed out bareheaded and in his shirt sleeves, but with his belt on, and a large corkscrew (the one exhibited on the trial and attached to the record) stuck in it.

The witness F. S. Moody, who went to the theatre with Habel, and who went away with him and was standing near him at the time of the shooting, testified substantially as follows: Had known Habel since previous April. Met him in Fort Worth. Defendant had never lived in Dallas. Witness first saw him in Dallas on the night of the shooting. Met him at a saloon at corner of Ervay and Live Oak streets (which is several blocks east of the scene of the shooting), and walked down town with him. They passed the Mascot Theatre, heard music, and went in and took seats. Witness had been drinking and went to sleep and knew nothing more until Habel woke him up to go home. They started to go out and passed the bar, when the girl (Jennie Clifford) called to Habel and asked him how many bottles of beer he had bought. Habel replied "two bottles." Deceased said, "You are a damned liar, you have only paid for one bottle." Habel said, "I did pay for two, sir; I bought two bottles." Deceased said, "You are a damned lying son-of-a-bitch; come out here and I will fix you." Habel said, "No you won't either." The deceased started out and Habel started out after him and witness followed Habel. Deceased went up in the alley ten or twelve feet. Habel staid in the end of the alley, and witness remained near the corner of the building to the left of Habel at the mouth of the alley. There was an electric light at the mouth of the alley. Witness could see deceased at the time of the shooting. He appeared to be coming toward defendant and had his hand like he was going to pull something. Habel told him not to pull any weapon or any thing on him. Witnesss did not know whether he said "weapon" or "thing," but about this time Habel drew his pistol and commenced firing. Three shots were fired and deceased fell at the last shot. After the shooting Habel said to witness, "See what that man has got on him," and repeated the request to the policeman who came up and arrested both Habel and witness.

Upon investigation by the grand jury witness was discharged without indictment. On cross-examination witness testified: "Gillette went up the alley and when I saw him he was coming toward Habel. * * * I don't know how many steps he took. About the time Habel fired the first shot, or a little before, he told Gillette not to draw a weapon on him.

At this time he was coming toward Habel. When the policemen told us. to come with them, Habel told them to see what deceased had on him first." On redirect examination he said: " Out in the alley I saw Gillette have his hand about something that looked bright. I did not know what it was. It glittered in the light. I do not know whether it was a. knife or a pistol. While the thing was being done a man did not have time to think much or to see much about it. I did not say Gillette did have something bright in his hand. I don't know whether it was in his: hand or about his hand. It looked to be about his waistband. He put. his hand something like this [witness illustrates, placing his hand about the waistband of his pants]. I could not tell exactly where he did put his hand, but it looked that way then." The witness further testified that he anticipated no trouble at the time they left the theatre, saw no sign of a fight, and simply thought they were going home.

Tony Buddy, an Italian fruit vender across the street from the mouth of the alley where the shooting occurred, and who kept open all night, testified, in substance, as follows: He remembers the shooting; and was in his door just across Main Street from the alley; the shooting occurred right in the alley; first saw three men walking on Main Street coming out of the variety theatre; there was one man in front and two behind; the one in front had no hat on and was in his shirt sleeves, and he went right up the sidewalk in the alley. There is a little pavement or sidewalk which runs back up the alley, along the side of the house, about fifteen or twenty feet. The man in front (deceased) went up the alley about fifteen feet and turned around. The man behind him (Habel) began shaking his head like he was saying something, and then he shot. At the time of the shooting, deceased was back in the alley about fifteen feet and near the left side. Defendant was about the middle (of the mouth) of the alley, and the other man (Moody) was by the door of the butcher shop (i. e., near the corner of the building on the left of the mouth of the alley). "I saw the deceased put his hand up this way [illustrating] to his hips, but could not see what he was doing." Heard nothing that was said. After the shooting the defendant stood there a little while—two or three minutes—before the policemen came and got him. When they took him he said he would go along with them, but he said to them, "Before you· take me to jail go up there and see what he has got on him," and the policeman and defendant went up to where the body was lying. The deceased had two wounds, one in the head and one in the side.

The defendant F. W. Habel being sworn in his own behalf testified, in substance, as follows: "I am 26 years old, and a native of Virginia. I have lived in Texas about one year, and am a painter by trade. I was in Dallas two days at the fair in 1888, being the only time I was ever here until the time of the shooting. I came here on September 18, 1889, on the evening train from Fort Worth, arriving in Dallas late in the after-

noon. I knew no one here but Moody. I inquired for him at Van Horn's shop, where I was told he was working, and learned he was not there. In looking around for him I met a man I had known in Fort Worth."

The defendant then testified in full as follows: "He said he was contracting. I asked him what the prospects were for a job, and he told me that he had need of a man to go out in the country to a small town. I don't know what the name of the place is where I first saw Moody. I met a man who took me to the hotel where Moody was stopping. It was the Southern Hotel. I left my umbrella and overcoat there, and I left them in Moody's room. This man that showed me the way was Gid somebody. He told me that he would take me down to where Moody was. He took me down to some saloon. I stepped in there and met Moody, and Moody shook hands with me, and I took a glass of beer with him. When we went out on the sidewalk some man was working there, and we stopped there a little while and then went on down the street. We passed by this place, where we heard some music, and went in there. The man that played the violin was an Odd Fellow, and he was also a German. He played a German piece of music, and I recognized it as a German piece of music. I talked some German to him, and asked him to play again and I would sing. He played the music again, and I sung it in a sort of droll way, to which nobody objected. This man Moody seemed to be a little sick, and I told them not to give him anything more to drink. He seemed to be a little drunk, and he went to sleep. I walked around in there, and this woman that was here called me in and asked me for 15 cents. I told her that I did not have 15 cents in change. She said, 'Then give me a nickle.' I told her that I would give her a nickle. I then went on back. I went on back to where Moody was, and after I staid there awhile I went on back to where the woman was. She asked me to buy her a bottle of beer. She said that there was going to be a medal offered there that night, and that she lacked a bottle of beer of having enough to get the medal. I did not ask anything about what the price of the beer was, and so I just ordered one bottle. She ordered another bottle, and he (deceased) brought in a bill of $2. I did not know what to make of this way of paying $2 for two bottles of beer. She wanted me to get another bottle of beer. I told her that she must think I was a fool to spend all the money I had for two or three bottles of beer. She said she wanted me to get another bottle of beer. I told her I would not. She said, 'Then get out of here.' I then went up to where Moody was and woke him up, and told him to let us go home. We came by the bar, and we were going to take a drink together. As we went up there we could see through to where the ladies were. She motioned for me to come over there. Some one asked me if I paid for two bottles of beer. I said I did; that I had given the woman $2. That was the man (deceased) that said that. I told him that I had given him $2 right in his own hands. He

said, "You damn lying son-of-a-bitch, you did not do any such thing, and if you will come out here I will show you.' I said all right, I would come. He went out and I went out after him. He went up to this alley and turned up there, and I followed him. He went up that way and turned around and advanced towards me. I saw him put his hand up to his belt [witness shows how], and I thought he was going to pull some weapon on me. I said, 'Hold on there, don't pull out any weapon on me.' I saw these two doors open on the opposite side of the street, and I saw the policeman that worked in the Mascot Theatre come out of the saloon there, and I saw another policeman coming across the street with him. When they came up to where I was I told them to look and see what the dead man had on him, or in his hand; that he had a gun in his hand, I said. The policeman walked along, and I had my gun in my hand, with my hands behind me (this way), and as the policeman came up I turned around and some one took my gun out of my hand. I thought the policeman took it out of my hand, but I did not know who took it; but we walked up to where the man was lying killed, and I saw the pistol lying in the door. I don't know who put it there, but I thought the policeman had it until then. It was about supper time when I went to this hotel. It was 7 o'clock, or a few minutes afterwards. We staid in that theatre during the performance. The performance lasted quite a while; two, three, or four hours. The time passed away so fast that I did not pay any attention to it. Moody was up and around there for a while when we first went in, but he soon went to sleep. The first time I saw Gillette was when he brought the bottle of beer out. I gave him a dollar for that, and I paid for the second bottle of beer. I paid Gillette for the second bottle of beer. I can't say positively what the dispute arose about, but I heard them talking something about money. The dispute was between Gillette and the girl. I had nothing to do with it at all. She called me over to where the dispute was going on. She asked me if I did not pay Ed for the two bottles of beer. I told her that I did, but he said that I did not. I told him that I did, and he said, 'You are a damn son-of-a-bitch, and you come out on the sidewalk and I will show you,' or said something about wiping up the sidewalk with me, or mopping the sidewalk with me, I don't remember which. I said, 'I will go with you; no, you won't.' Gillette went out then. He went first. He was about turning up the alley when I got out of the door. Moody followed me. I woke him up for the purpose of going home."

Q. Did you have any expectation of anything like a fuss when you went out of the door?

The State objected.

Defendant read to the court, as an authority for introducing the testimony, Wharton's Criminal Evidence, page 365.

Objection was then overruled.

"My intentions were to go on out there, and if he left me alone and did not bother me any more, to go on home. I was a stranger in town, and had but little money, and I wanted to go to work. At the time I reached the mouth of the alley the man was up in the alley, and he had his hand in such a way as if to draw a weapon. He had his hands in an attitude of drawing a weapon. He put his hand up to his hip pocket. When he made the advance on me I saw something that looked like the butt end of a revolver. I could not tell what it was. I came down that alley when I went to the Mascot Theatre. This was on my way home. Our boarding house was north of Main Street. Going up that alley was in the direction I had to go to go back to the hotel. At the time I fired the first shot I believed the man was going to shoot or cut me; I did not know which. I was so excited that I did not know whether I was shooting towards the man hardly or not. I did not realize hardly how many times I had shot. I brought this revolver with me that day. I went into my trunk for some things and saw it, and just put it in my pocket. I intended that if I did not get a job in Dallas to go on to Memphis, Tennessee. I never saw Gillette before I bought the beer in there that night. I had no previous grudge against him. I had no previous difficulty with him."

On the cross-examination he said: "When this man Gillette left the room he left ahead of me. I suppose he was fifteen or eighteen feet from me. Well, he was ten feet in advance of me when he left the house. I think he had a vest on when he left the theatre, but he was in his shirt sleeves. I could have seen his hip pocket if I had looked at it before he left the house, but I did not notice his pocket. I could have seen a pistol, perhaps, in his hip pocket, if he had had one there, if I had noticed it. He put his hand in his hip pocket as he turned around and fronted me. His back was towards me as he went up the alley. He did not open a bottle of beer in front of me. I did not see him open a bottle at all when I bought the beer. The beer was opened when it came to me. I never saw this corkscrew until I saw it in the court room here. I did not see any such corkscrew in the theatre there that night. When I told him that I had paid for the beer he said that I had not, and then he said something about sweeping the sidewalk with me. He started out, and I went out after him."

It is here agreed by both sides that the corkscrew exhibited in court upon the trial in progress is the one taken off of Gillette's dead body, and the one he used at the variety theatre.

T. C. Halsell, a police night watchman, testified that he remembered the killing and saw the body of the deceased that night after the shooting. When the shooting occurred witness was about two blocks away; heard three shots and ran down there immediately and found a few people there, including two policemen. The deceased was lying on his face,

about twenty feet up in the alley, with his head about two feet from a little sidewalk there, near the edge of and at the end of the little sidewalk, which is five or six feet wide. Deceased was not dead when the witness got there, but never spoke, and died in a few minutes. As the body lay it had one leg drawn up and the other stretched out; it lay on its face, and the right hand was under the breast and the other by the side. The body was turned over while witness stood by it, and "right about where the pit of the stomach of deceased was on the ground there was a corkscrew lying. It was lying loose on the ground." Witness said, "I have seen the deceased wear this corkscrew many a time in his pants belt." Being shown the corkscrew referred to and incorporated in the record, witness said, "If this is not the corkscrew I saw there that night it was. one just like it. I picked up this corkscrew right under his body. The corkscrew was not fastened in his belt. His right hand was under him. on his breast, and the corkscrew was about the pit of his stomach."

S. N. Braswell, justice of the peace who held the inquest, testified that. the deceased had two wounds. One was about the lower portion of the ribs on the left side, and the other somewhere above the eyebrow on the left side of the head.

The sketch of the corkscrew, which is made part of the record by agreement, and the corkscrew itself, which by agreement and by order of the court is attached to the transcript, show it to have been a large one, such as is used for opening wine and beer bottles; with a polished, dark colored, wooden handle about four inches long, in one end of which is. inserted a stout, sharp blade or knife about two inches long, for cutting wire. The staff or screw itself is about six inches long, very strong and sharp-pointed. The instrument is a formidable one and easily capable of inflicting the most serious and fatal injuries. Moreover, when worn in the belt, as it was by deceased in this case, and attempted to be drawn, as the testimony shows was the fact, the size, shape, and appearance of the implement, and the place and manner in which it was worn and would naturally be grasped by the person wearing it, would lead any one to readily conclude that it was a knife or pistol—most likely the latter. It was itself a deadly weapon, and as used or sought to be used by deceased at the time of the shooting would almost inevitably and conclusively have convinced any man of ordinary prudence, courage, and observation that a deadly assault was about to be committed upon him.

An inspection of the plat or map introduced in evidence and referred to by the witnesses, a copy of which is incorporated in the record, discloses the following facts: The "Southern Hotel," to which defendant went upon his arrival in Dallas late in the afternoon of September 18, 1889, is several blocks to the north and east of the Mascot Theatre, where this difficulty began. The theatre is on Main Street, which runs in a general direction from east to west; Elm Street is the next street north of Main,

running parallel thereto; Sycamore and Oleander (which is the northern continuation of Ervay Street) run in a general direction from north to south, intersecting Main and Elm streets at points east of the Mascot Theatre—Sycamore being the first street east of the theatre, and Ervay (or Oleander) the second street east.

The blocks are very wide along Main and Elm between the streets named, and the alley in which the shooting occurred is about fifty feet east of the theatre, connecting Main and Elm streets, and is a general thoroughfare for pedestrians coming from the north and east down Elm and into Main. It was lighted and paved. The hotel at which Moody was stopping, and to which Habel went and left his effects on arriving in town, was at the corner of Oleander and Sycamore—a point several blocks north of Main Street, and northeast of the theatre. It is proper to state, as is shown by the map, that Oleander and Sycamore streets are very crooked, and though supposed to run parallel do in fact intersect each other at the place where this hotel was situated. Live Oak Street diverges from Elm Street two blocks north and east of the theatre (at the intersection of Elm and Ervay, Oleander being but another name for the northern continuation of Ervay), and it was at the corner of Ervay and Live Oak that Moody and Habel first met that night, at Trammell's saloon. They came down Elm Street (west) and crossed into Main Street (south) through this very alley, and then down Main (west) about fifty feet to the theatre. It will thus be seen that in leaving the theatre that night and going up Main Street (east) Moody and Habel were going in the direction of their hotel, at the corner of Oleander and Sycamore; to have gone in any other direction would have necessitated their walking entirely around the block towards the west, and then north and east, which would have been to go in an entirely different direction from that which was the most natural and direct route home. Defendant was a stranger in Dallas, not familiar with its streets, and would naturally traverse the streets and alleys with which he had become best acquainted. His and Moody's testimony show that in coming to the theatre that night they had come through that alley. Habel was going back to his hotel by the same route by which he came, and by the most direct route to the hotel. In passing the mouth of the alley, or even in going through it, he was on his way home; and if Gillette posted himself in said alley he was intercepting defendant on his way hame; and was in fact lying in wait for him. Defendant was on his way home when he reached the mouth of the alley, and Gillette had placed himself in the way and challenged his passage by acts and gestures threatening a deadly assault. Habel says his purpose was to get away and go home and to have no further trouble if Gillette did not bother him any further; that he was a stranger without money, hunting a job, and wanted to get away from there without trouble, and that such was his purpose and intention when he left the

theatre that night. All the testimony shows that deceased provoked and invited the difficulty, and voluntarily and viciously put himself in defendant's pathway to his lodging place and made every demonstration indicating a murderous intent against Habel.

The objectionable portions of the charge are obnoxious as claimed to the serious objection that they charge upon murder in the first degree, and lay stress upon that grade of homicide, when, as is seen from the above recital of the facts of this case, there could have existed no element of such malice as constituted that offense. · The charge as to the malice having arisen "in a moment's time" is particularly erroneous and misleading in connection with the facts of this case. Blocker v. The State, 27 Texas Ct. App., 16 *et seq.*, and cases cited; Willson's Crim. Stats., secs. 2335–2337, and authorities there collated and cited.

*W. L. Davidson*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE. — Appellant was convicted in the lower court of manslaughter, and given two years in the penitentiary.

Appellant was indicted and put upon his trial for murder. The record sufficiently shows that the court ordered the summoning of the special *venire* out of which the jury was to be selected for the trial of the case, and the objection to the transcript in that particular based upon the rulings in Steagald's case, 22 Texas Court of Appeals, 486, is not maintainable.

As to other objections to the special *venires* for talesmen, it is first urgently insisted that the same should have been quashed because the court declined and refused to administer to the sheriff and each of his deputies the oath prescribed by article 3056 of the Revised Statutes before they executed said writs. That statute reads: "Whenever it may be necessary to summon jurors who have not been selected by jury commissioners under the provisions of this title, the court shall administer to the sheriff and each of his deputies the following oath: 'You do solemnly swear that you will, to the best of your skill and ability, and without bias or favor toward any party, summon such jurors as may be ordered by the court; that you will select none but impartial, sensible, and sober men, having the qualifications of jurors under the law; that you will not, directly or indirectly, converse or communicate with any juryman touching any case pending for trial; and that you will not by any means attempt to influence, advise, or control any juryman in his opinion in any case which may be tried by him, so help you God.'" This statute has been held applicable in criminal as well as in civil cases. Wyers v. The State, 22 Texas Ct. App., 258.

When this statute was originally passed it expressly provided in terms that the oath should be administered "at the commencement of each term

of the court at which jury cases may be tried." Hicks v. The State, 5 Texas Ct. App., 488. In the revision, as shown in article 3056, *supra*, it is not stated in terms at what particular time the oath should be administered, but we think it is apparent from the language used that if it has once been administered that will suffice thereafter at the same term for the summoning of all "such jurors as may be ordered by the court," and that it is not necessary to have the oath repeated every time new or additional talesmen are be summoned. In explaining the bills of exception on this point the learned trial judge states that the said oath was duly administered to the sheriff and deputies on the first day that the criminal docket was taken up, and that none but the officers so qualified took part in summoning the talesman in this case. He also certifies that in each instance before the said talesmen were summoned he cautioned the sheriff as to his duty in summoning them, as provided shall be done by article 615 of the Code of Criminal Procedure. This was the necessary and proper practice. Defendant's objections to the action of the court in this matter are without merit.

Perhaps we should have first noticed the defendant's objections to the issuance of *venires* for talesmen until certain of the original *veniremen* who had been summoned, and who were absent, had been attached and brought into court to be passed upon. He also asked a postponement of the trial until this could be done. Attachments were promptly issued for these absentees as soon as demanded, but a defendant can not unreasonably delay the trial on account of the absence of such summoned jurors. Code Crim. Proc., art. 640. The questions here raised were fully discussed in Hudson's case, *ante*, 323. No error is made to appear in relation to this matter.

Many objections are made and criticisms indulged in with regard to the charge of the court.

In so far as murder of the first or the second degree is concerned, all such questions are eliminated by the fact that defendant has been convicted of manslaughter and not murder. As to manslaughter, the charge embraced all the statutory rules with regard to that crime. Had defendant not been found guilty of manslaughter the charge might have been held insufficient as not pertinently applying the law of that grade of crime to the particular facts of the case, and defendant, in a special requested instruction which was refused, attempted to call the attention of the court to the omission. The instruction was not itself the law, but was sufficient to call the attention of the court to the necessity of an instruction directly applicable to the facts. An instruction was given by the court with regard to mutual combat entered into where death or serious bodily injury likely to result in death might ensue, and properly instructed the jury that in such state of case self-defense would not apply. King v. The State, 4 Texas Ct. App., 54; Crist v. The State, 21

Texas Ct. App., 361; Thumm v. The State, 24 Texas Ct. App., 667; Williams v. The State, 25 Texas Ct. App., 216; Willson's Crim. Stats., sec. 982. But the court did not instruct as to what the law would be if defendant went out to engage in a fisticuff with deceased, and with no intention of having a deadly contest or using a deadly weapon, and that his deadly weapon was only used after deceased was apparently about using a deadly weapon upon him. The facts perhaps called for some such instruction. But in such case the defendant's right of self-defense would not have been, as is insisted by counsel, a perfect one and entirely justifiable in law, but would have been imperfect to the extent of the gravity of the offense which he intended to commit originally. He went out to engage in an affray, which is a misdemeanor. Penal Code, art. 313. "A perfect right of self-defense can only obtain and avail where the party pleading it acted from necessity and was wholly free from wrong or blame in occasioning or producing the necessity which required his action. If, however, he was in the wrong, if he was himself violating or in the act of violating the law, and on account of his own wrong was placed in a situation wherein it became necessary for him to defend himself against an attack made upon himself, which was superinduced or created by his own wrong, then the law justly limits his right of self-defense, and regulates it according to the magnitude of his own wrong." Reed v. The State, 11 Texas Ct. App., 509; Willson's Crim. Stats., sec. 982. If the original wrong of defendant was or would have been a misdemeanor, then the homicide growing out of or occasioned by it, though in self-defense from an assault made upon him, would be manslaughter if committed under the immediate influence of sudden passion arising from an adequate cause, such for instance as anger, rage, terror, or resentment. Spearman v. The State, 23 Texas Ct. App., 224.

The court did not err in refusing defendant's second special requested instruction on this subject, because it did not state correctly the law applicable to the facts; and whilst the court omitted to charge at all on that phase of the case, the error was harmless, because defendant was found guilty of manslaughter, and that would have been the finding under the charge had it have been given correctly and adopted as the basis of the verdict.

A bill of exceptions was taken to the following language used by the county attorney in his closing argument to the jury: "Gentlemen of the jury, I tell you as an honest man and citizen, that it is my candid and honest belief that this defendant is guilty of murder of the first degree, and you ought to find him guilty as such." Defendant did not request the court in writing to instruct the jury that they should not be influenced by the attorney's individual opinion as to the defendant's guilt. This should have been done, and if the court had then refused to give such instruction the question would then have been properly presented

for adjudication. "While it is true that authors treating upon the subject say that counsel either for or against the prisoner should never express their opinion as to the guilt or innocence of the accused, yet we would hesitate at this day to reverse a judgment on account of a violation of this rule." Young v. The State, 19 Texas Ct. App., 536; Kennedy v. The State, Id., 618. There are, however, recent instances where the mode and manner of expressing such an opinion on the part of prosecuting officers has been held sufficient ground for reversing a judgment of conviction. The People v. Quick, Mich. Sup. Ct. (reported in full in 7 Crim. Law Mag., p. 81). "The impropriety of expressing a personal opinion to the jury upon disputed facts has always been regarded as great, and has in some notable instances led to unpleasant strictures on the character of celebrated counsel." Id.

Defendant testified as a witness in his own behalf. The county attorney commented upon his testimony, which he had the right to do as in the case of any other witness; but he also indulged in some very harsh reflections as to the credibility of those defendants who would testify in their own cases, and warned the jury that "so long as defendants are to be believed when testifying in their own behalf no man will ever be convicted in this State." This language was excepted to and special instructions were asked in regard to how the testimony of a defendant in his own behalf should be considered, which were refused. The court, however, charged the jury: "You are by law made the exclusive judges of the credibility of all the witnesses before you in this case, and of the weight you should give to their testimony, and after you have considered all the evidence before you, if you have in your minds a reasonable doubt as to the guilt of this defendant, you should acquit him."

"We are not disposed to reverse judgments for merely indiscreet ebullitions of counsel which may be allowed for and are neutralized by the effect of the charge." In this instance the charge of the court, we think, fully neutralized whatever unwarranted expression of opinion the prosecuting officer had indulged in, and we can not think that such idle declamation could or would have the same weight with the jury as the charge of the court. Defendant's special requested instruction was obnoxious to the objection that it was a charge upon the weight of evidence, and it was properly refused.

We have considered all the material questions in the case, and having found no reversible error, the judgment is affirmed.

*Affirmed.*

Hurt, J., absent.

ON MOTION FOR REHEARING.

WHITE, PRESIDING JUDGE.—We have carefully re-examined the record in this case in connection with the appellant's motion for rehearing and the able argument of counsel in support of the same.    There is but one question which we deem it necessary to reconsider.

As before stated, the court submitted to the jury in its charge the law of murder in the first and second degrees.   Appellant objects to the charge on murder of the first degree, and claims that the court erred in charging the jury the law of murder in the first degree for the reason "that the evidence in the case did not call for nor warrant a charge on that grade of homicide; and the charge given on that subject was calculated to mis-lead the jury, and laid undue stress on murder in the first degree and did in fact prejudice defendant's rights."

Defendant was found guilty of manslaughter, and in our opinion hereto-fore rendered in alluding to this assignment of error we dismissed this sub-ject with the remark that, "in. so far as murder of the first or the second degree is concerned, all such questions are eliminated by the fact that. defendant has been convicted of manslaughter and not murder." Our attention has been called to the fact that this statement is incorrect in view of the manner in which the question is presented in the record.. This portion of the charge is specially excepted to, as shown by defend-ant's thirteenth bill of exceptions.

The rule is that the charge must be applicable to and limited by the evidence; and furthermore, that a charge which has no application to any evidence adduced on the trial is erroneous and calculated to confuse the jury and mislead them, and it is radical error for the court to assume and charge upon a theory not raised or indicated by the evidence.   Will-son's Crim. Stats., sec. 2347.

Again, it is well settled that "if the error, however immaterial it may be, is promptly excepted to, and presented by a proper bill of exceptions on appeal, the statute (Code Crim. Proc., art. 685) is mandatory that the conviction shall be set aside without inquiry as to the effect of such error upon the jury." Willson's Crim. Stats., sec. 2363.

Under these rules, and the manner in which the question is presented,, the fact that defendant was convicted of manslaughter does not eliminate the question as to the authority of the court to charge upon murder of the first degree in this case.

As to the law as presented upon this degree of murder we think it suffi-ciently full, comprehensive, and explicit, and not objectionable for any reversible error.

It then remains to be seen whether such a charge was called for or authorized by any evidence in the case.

There were two theories in the case as made by the evidence. One that defendant went out of the theatre upon the invitation of deceased with his deadly weapon upon his person, if not in his hand, and with the purpose and intent of using it in the combat to which he was invited. The other was that he went out merely to engage in an affray. If the former theory was correct then his crime was murder; if the latter it was manslaughter. Under the facts the issue of murder in the first and second degrees was clearly raised and the court did not err in submitting these issues.

We have found no sufficient reason to warrant us in setting aside our former judgment of affirmance in this case, and the motion for rehearing is overruled.

*Rehearing refused.*

Judges all present and concurring.