LOGAN MILRAINEY v. THE STATE.

*No. 317.    Decided November 21.*

| 33 | 577 |
| 37 | 17 |

1. **Defendant as a Witness—Right to Corroborate His Evidence When Impeached by Cross-Examining Witness as to Matters not Strictly in Rebuttal.**—On a trial for murder, where it appeared that the fatal difficulty occurred with regard to the right of possession of defendant to a certain tract of land under a rental contract, and after defendant had, as a witness in his own behalf, testified as to said contract, the State introduced a witness in rebuttal of his testimony on a single

point. On cross-examination defendant proposed to prove by this witness all the facts with reference to terms of the contract, which was objected to by the State, upon the ground that defendant was only entitled to cross-examine as to rebutting evidence, and that the evidence sought was original and not rebutting, which objection was sustained by the court, and the evidence rejected. *Held*, the only testimony as to the rental contract being that of defendant, and his guilt being mainly hinged on his right to the land, it was necessary to a due administration of justice to permit appellant, if he could do so by cross-examination, to corroborate his own evidence by the witness, and error to refuse him the right to do so, though the testimony sought was outside the witness' direct examination.

2. **Murder—Charge—Provoking Difficulty—Self-Defense.**—On a trial for murder, where there was no evidence that defendant at the time of the homicide was engaged in a felony or misdemeanor, or that he provoked the difficulty either with or without the intent to kill, it was error for the court to predicate or limit his right of self-defense on such theories.

3. **Same.**—One going in good faith to work upon his own premises could not be said to be provoking a quarrel or engaged in a misdemeanor or felony, even though he may have had reason to believe that his presence on the land might be offensive to another; and a charge submitting such issues, in the light of such facts, is inapplicable and erroneous.

4. **Charge—Erroneous, When.**—It is error for the court to so frame its charge as that it may operate, whether correctly or not, as suggestions to the jury of the views of the court as to the defense in the case, and lead them to accept as true a theory which has no other foundation than judicial incredulity and suspicion.

5. **Charge—Manslaughter—Adequate Cause—Attack on One's Property.**— Even where it may not justify the taking of human life, an attack on one's property is justly regarded as a great provocation, and constituting adequate cause; and especially so when accompanied with such aggravating circumstances as might well be calculated to arouse the passion and resentment of a person of ordinary courage and spirit; and in such state of case the charge of the court should certainly apply the law of manslaughter more specifically than in the general terms of the statute.

6. **Evidence—Murder of the Second Degree—Fact Case.**—See evidence which the court holds is insufficient to support a conviction for murder of the second degree.

APPEAL from the District Court of Bell. Tried below before Hon. W. A. BLACKBURN.

This appeal is from a conviction for murder of the second degree, the penalty assessed being fifteen years' imprisonment in the penitentiary.

The salient features of the case will be seen from the following portions of the evidence, which we reproduce from the brief of appellant's counsel, and which is substantially correct as copied from the statement of facts:

The story of the homicide as told by the defendant, who testified in his own behalf, was as follows: "I am 24 years old; was raised in Tennessee and came to Texas in August, 1890; came directly to Bell County; worked for Mr. Jones in his gin, about two miles from the farm of Mr. L. R. Parker, the first fall I came to Bell County. The next year I worked for J. J. McVey, doing ordinary farm work, and

afterwards for Mr. Robertson. In the falls of 1891 and 1892 I again worked in Jones' gin. In 1893 I bought a team and made a crop, renting land from Mr. Kinney and Mr. Watts. Part of the land I rented and worked during the year of 1893 was adjoining Mr. R. L. Parker's farm. I had known Mr. Parker ever since the fall of 1890. I saw him frequently during 1893 when I was cultivating the land adjoining his farm, and became quite well acquainted with him. Sometime in July, 1893, he came to me in the field where I was at work and asked me if I had rented land for another year, and told me that he had some land to rent, and that he would be glad for me to get it if I wanted to rent. I told him that I was looking for my brother to come out to me from Tennessee and make a crop with me another year, and if he did I would want about sixty acres, and if he did not come I wouldn't want so much, and until I learned for certain whether my brother was coming out I couldn't tell how much land I wanted. Sometime in August, 1893, I learned that my brother was not coming, and the first time I saw Mr. Parker I asked him if he still had the land to rent. He said no, he had rented it to A. B. Harris, but that Harris had rented twenty-four acres more land than he could tend in order to get another room built to his house; and that Harris would either have to subrent the twenty-four acres or hire a hand to work it, and if I could get it from Harris it would be all right with him. I went to see Harris about the land and he said he would rent it to me, and I asked him if he could board me at his house while I worked the land. He said he would see his wife about it and let me know. That evening I saw Mr. Parker down at Jones' gin and told him of my talk with Harris, and asked him if he would build me a crib to put my corn in. He said no, he had rented the land to Harris, with the house and improvements Harris was using, and was under no obligations to spend any money on it for a crib. I then rode by Harris' house, and he said that Mrs. Harris was willing to board me. I then spoke to Mr. Parker about having no place to put my corn, and he said if I would haul the lumber from Temple and build the crib myself, he would pay for the lumber. I agreed to do that, and afterwards Harris and myself closed the trade for the land. Mr. Parker agreed for me to rent the land, and about the 1st of October, 1893, I moved to Harris' house and commenced boarding there, and about that time Mr. Parker and myself went to Temple with my wagon and team and he bought lumber for me to build a crib from Mr. Lovitt, and I hauled it to Harris' and built a crib, and afterwards gathered my corn off the land I had rented for the year 1893, and put something over a hundred bushels of it into the crib. I continued to board with Harris, and a short time after I moved there Harris and myself went down on the land he had rented from Mr. Parker, and he pointed out a 24-acre field as the land he was letting me have, and we went down and walked over the land and

looked at it.    I went right along gathering my crop on the Watts and Kinney land, getting ready to go to work on the 24-acre tract, till one Monday night, about the 1st of November, 1893, Harris remarked to me that Mr. Parker was wanting to get the land back.    I told Harris that I couldn't give the land up; that I had built my crib and moved my corn there, and made my arrangements to cultivate the land, and that it was too late for me to rent land anywhere else; and I would be thrown out entirely if I gave the land up; and that I wasn't going to do it.    On the Wednesday night following, Harris told me that he had turned the land back to Mr. Parker; that Mr. Parker wanted the land back and he had let him have it back; that he (Harris) thought I didn't want the land.    I told Harris that he had no right to turn the land back to Mr. Parker and throw me out in such a way, and that I was not going to stand it if I could help myself.    The next morning Mr. Parker came up to the lot at Harris' where I was, and stopped on the outside of the fence and spoke to me in a rough way.    We talked there for sometime, and I told him I was not going to give up the land if I could help it; that I didn't think he was doing right, trying to throw me out that way.    He said, 'I forbid you ever setting foot on that land and ever travelling the road from here to my house; and if you ever make a mark on that land you will do it at the peril of your life.'    After that Harris and myself agreed to leave the matter to arbitrators—he to pick one man, I to pick one, and they to pick a third, and we to submit the matter to them and abide by their decision as to whether I was to have the land or not.    Mr. Parker knew all about this agreement between Harris and myself.    I picked Oscar Jones, Harris picked A. F. Jones, and they picked Henry Butler, and we both went before them and agreed to abide by their decision.    We then each made our statement to the arbitrators, and they decided I was entitled to the land, and so stated in their decision.    I made the same statement with reference to the renting of the land before the arbitrators that I have made here in this trial.    About the time I talked with Mr. Parker at Harris' lot I heard that McCorley was at work on the land.    I went down there and found him cutting stalks, and told him that I had rented the land and was entitled to it, and requested him to let the land alone till the matter was settled.    I told him I had not given the land up, and was still claiming it.    We had the arbitration about the 8th day of November, 1893, and that night Harris told me I would have to get another place to board; and the next day I moved to Mr. J. G. Buster's, about a mile from Mr. Parker's.    Sometime in November I saw Harris, and told him if he would pay me $50 I would give up the land rather than have any fuss over it.    He said that was too much, and I then proposed to leave the amount of damage to the same three men that had arbitrated the matter.    We did not come to any agreement at that time, and I told Harris he must let me know

what he was going to do about it before the 1st of December, as I would have to go to work on the land by that time if I could not make some other arrangement.  *  *  *  I consulted lawyers about the land before the arbitration.  I went to Messrs Moffett & Anderson, in Temple, and told them just what I stated here, and they told me I was entitled to the land and had a right to make a crop on it.  I went to them again after Mr. Parker threatened me and asked their advice about the matter, and they told me the same they did before, and told me I was in possession of the land, and whenever I got ready to go to plowing to go right ahead and go to plowing, and pay no attention to Mr. Parker; that he had no right to put me off the land.  These are the same attorneys who are now present in court defending me in this case.  On the morning of December 4, 1893, I hitched up my team to my plow and drove them, dragging the plow, from John Buster's, where I was boarding, to the 24-acre tract of land.  My nearest route would have been by Harris' house and along the road which Mr. Parker had forbidden me to travel, but I went around below the rest of Mr. Parker's farm, and came in on the 24-acre tract of land.  I did this to avoid irritating or aggravating Mr. Parker, and in order to avoid a difficulty with him.  It was about 9 o'clock in the morning when I got to the land, and I drove in on the southwest corner.  McCorley and Mr. Parker's two grown sons were plowing on the south end of the land, and were about thirty or forty yards from me when I drove in.  I said nothing to them, and they said nothing to me.  I plowed a furrow from the southwest corner of the land to the southeast corner, on the outside of the land McCorley had plowed, and then turned north along the east line of the land and plowed to the northeast corner; then along the north line to the northwest corner.  I then plowed south along the west line of the land, and had gotten about 200 yards from the northwest corner, when I heard some one halloo at me out to my left and east of me, towards Mr. Parker's house.  I looked up and saw Mr. Parker coming towards me from that direction, waving his right hand.  I stopped my plow at once.  Mr. Parker was about twenty-five or thirty yards from me when I stopped, and was directly east of where I was, and the furrow I was plowing ran north and south, and I was plowing south.  When I stopped, Mr. Parker was coming directly towards me, and continued to walk rapidly towards me, talking as he came.  The first thing he said to me after I stopped was, 'Logan Milrainey, didn't I tell you I would kill you if you ever made a mark on this land?'  I replied, 'Yes, but I have rented the land and I think I've got a right to work it.'  He said, 'Get off.  Get out in that road, or I'll kill you,' and waved his right hand towards the road, which was a few feet west of me.  When he said this he had gotten within a few feet of me, and I said, 'No, Mr. Parker; I have rented this land and I've got a right to work it,' and

he then turned from coming towards me and ran to my horses' heads and caught them by the bits, and pushed them around towards the road, saying as he did so, 'Get off. Get out in that road, or I'll kill you.' When I first stopped my plow I took my lines in my right hand and held the left plow handle with my left hand, and when he caught the horses' heads and pushed them over towards the road, I took the left line in my left hand and pulled the horses back into the furrow against him, saying, as I did so, 'Mr. Parker, let my team alone.' When I did this he turned the horses loose and stepped back from their heads, and started towards me, saying, as he did so, 'I'll kill you, God damn you; I'll kill you,' and reaching down with his right hand in his right boot-leg, with his left side towards me. When I saw his hand go into his boot-leg I thought he had a pistol there and was going to draw it and shoot me, and I jerked my pistol from my waist-band and fired on him at once, and I fired twice more at him. When I fired the last two shots he raised up straight, threw up his hands, and staggered towards me, and fell a little to the left of my plow, and a little behind it. The pistol I shot with was a double-action Smith & Wesson 38 calibre, and I fired the first shot while he was stooping over with his right hand in his right boot-leg. There was a slight pause after the first shot, and then I fired the last two shots right together, as close together as I could fire a double-action pistol. I never fired at him after he threw up his hands, or after he fell. The pistol had five loads in it, and there were two charges in it after I fired the last shot. I couldn't tell anything about where the different shots struck him. I just shot as quick as I could. The moment he fell my horses started off, and I plowed right away from him. When I got about forty yards from him, McCorley and Mr. Parker's two sons passed me on my left, going to him. They didn't speak to me nor I to them. When I got about 100 yards further I met Henry Buster and Sid Madden, and told them I had shot Mr. Parker, and that he was lying up there in the field; and they went on up to where Mr. Parker was lying. I plowed on down to where I had commenced plowing, and then went on over to John Buster's, where I was boarding, and sent word to the officers that I was there. I staid there till that evening, when Mr. Thompson, the constable, came and arrested me. I have been in the Bell County jail ever since. The first time I heard Mr. Parker call to me, he called in a loud, angry tone of voice, and everything he said there was said in the same tone; and when I pulled my horses back into the furrow and he started back towards me, his face seemed to be white with anger, and he appeared to be furiously angry; and when he reached down into his boot-leg, I felt certain he was about to draw a pistol and shoot me. I had known him for two or three years, and I regarded him as a determined man, and a dangerous one when he was angry. I regarded the threat he made against

me at Harris' lot as a serious threat, and when he came there where I was plowing and acted as he did I felt certain he was about to put the threat into execution. My understanding was that the arbitrators gave me the 24-acre tract of land on which the difficulty occurred. That was the only tract of land that was ever mentioned between Harris and Parker and myself, and was the only land I ever claimed. The arbitrators didn't specify that particular tract, but they gave me twenty-four acres of land, and that was the only land that was ever in dispute. Harris had pointed out that land to me, and that was all the land he rented to me, and that Parker agreed for him to rent to me. I rented the land from Harris for the crop year of 1894, and I went there and commenced plowing to prepare the land for the crop of 1894."

On cross-examination defendant testified: "I bought the pistol from the Smith & Wesson Manufacturing Company about a year before the day of the killing. I had carried it to my work with me frequently before the day of the killing, and at other places whenever I wanted to. I knew it was against the law. I was not to say expecting a difficulty with Mr. Parker that day, and I did not take the pistol for the purpose of killing Mr. Parker, and I did not go there intending to kill him. I suppose I killed him. I shot him and he fell, and I heard afterwards he was dead. I went there that morning to plow, and I took my pistol with me to defend myself in case Mr. Parker attempted to put into execution the threat he had made. I was afraid he would try to kill me, and I carried the pistol with me to protect myself. Mr. Parker was about 50 years old. I am 24 years old. I have no family. Mr. Parker had a large family. He had two sons grown, about as old as I am. He had about eight children, some of them going to school. I did not carry my pistol with me to cultivate the land; I carried it to protect myself. I never told Harris nor any one else that I was going to quit farming and work for Jim Watters for wages. The only thing I ever said to Harris was the Sunday evening before he told me Mr. Parker wanted the land back on Monday night. We were both lying on his gallery, and I spoke in a joking way and said, 'I believe I will go to Temple and strike Jim Watters for a job.' I was joking at the time, and Harris knew I was not in earnest; and I told him positively on Monday night that I wouldn't give up the land, and that was before he agreed to let Parker have it back on Wednesday following. I did not tell H. C. Bray that I would cultivate the land or lose my life. I did not tell him I was going to cultivate the land with a knife. I never told Tom Gray that I was going to give up the land and go to Collin County. I never said to W. A. Mills, 'I am not going over there to plow without something to shoot with.' J. G. Buster told me the morning of the difficulty, that if he was in my place he would not go over to plow the land. G. V. Pless advised me the night before not to go over to plow the land. The lawyers I consulted about the land did

not tell me to kill Mr. Parker. They told me that I was in possession of the land and that Mr. Parker had no right to put me off, and I believed what they said. I offered to give the land up if Harris would pay me $50. I don't suppose I would have killed Mr. Parker, had Harris paid me the $50, for I wouldn't have gone on the land. I proposed to take $50 and give up the land, not because I wanted to give it up, but in order to avoid any trouble over it. I didn't kill Mr. Parker for the $50. I killed him because he was trying to kill me. I came from Warren County, Tennessee. Was raised about six miles north of McMinnville. Left there August 8, 1890. I was never indicted for any offense before this in my life. My mother died before I left Tennessee; my father died since I left there. There is only one man that I know of in Bell County that I knew before I came here. His name is Kirby, and he is here summoned as a character witness for me. I had known Mr. Parker for about three years; had been with him a good deal. Don't think I ever heard him use an oath or swear in any way until the moment before I shot him, when he said, 'I'll kill you, God damn you; I'll kill you.' I think that was the only oath I heard him use. Mr. Parker was the owner of the land. I never paid a cent of taxes on it in my life. I never did a lick of work on it till the morning of the killing. I was not living on the land at the time of the killing. I was living at John Buster's, one and one-half miles from it. I knew that Parker had rented the land to McCorley. McCorley and Parker's sons were plowing the land when I got there. I did not tell O. C. Gerald that I was going over there to plow, and the Parkers could just shoot if they wanted to. I did not use J. G. Buster's pistol; I used my own. I took the loads out of Buster's pistol and put them in my own that morning. It was my ammunition that I took from Buster's pistol. The road that Mr. Parker forbid me travelling was his own private way in his field. I did tell A. B. Harris that I saw Mr. Parker in Temple, and when I saw him it made me so mad I could not talk to him. I saw McCorley and the Parker boys at work on the land when I drove on it. They were plowing in lands; they had plowed three or four lands when I came on it. I did not plow in lands. I plowed around the entire 24-acre tract. When I fired the shots Parker had his left side to me and was stooping or leaning over to the right, with his right hand in his right boot-leg. Parker was not standing up straight facing me when the shots were fired. I rented the land from Harris for the year 1894."

Jim Simmonds, a witness for the State, testified with reference to the wounds on the body: "There were three bullet holes in his body; the first directly below and the width of three fingers from the right nipple; the second directly below and the width of four fingers from the left nipple; the third in the left shoulder, about half-way between the left side of the neck and the point of the shoulder, and about

three inches back of the top of the shoulder, and entering just above the left shoulder blade, and from the appearance of the hole ranging downward in the body and towards the backbone."

Henry Buster, for defense, testified with reference to same: "There were three bullet holes in the body; one directly under the right nipple and about three inches below it; one directly under the left nipple, and a little lower down on the body than the one on the right; and one in the left shoulder, just back of the top of the shoulder, and about middle way between the point of the shoulder and the left side of the neck, and ranging downward and forward and towards the centre of the body."

Matt James, a witness for the State, testified with reference to the shooting: "I heard somebody talking down where the shooting took place. I looked around and saw the man who was plowing, and another man going towards him. I was about 200 yards north of the parties, and Mr. Parker's house was 300 or 400 yards east of them. When I looked around, the man who was plowing had stopped his team and was standing at his plow, and the other man was approaching him from towards Parker's house. The horses' heads were pointing south, and the man at the plow was between me and the horses. The man who came from towards Parker's house went up to the horses' heads and staid there a moment, and then stepped back from the horses; and the man at the plow fired two shots, and I saw the other man sink down; and then the man who was plowing plowed on down the row and left him lying there. The men were standing about five steps apart when the shots were fired, and the man who was shot was standing up straight and was facing the man who fired the shots, and was not leaning over. I saw the smoke from the shots and heard the reports of the pistol. I only heard the reports of two shots, and they were fired in quick succession. I was about 200 yards from the parties. I don't think I heard the voice of but one person talking; don't know which of them did the talking. When I first saw them, the man with the plow had stopped his team and was standing at his plow; the other man was about twenty-five or thirty steps from him, and was going towards him from direction of Parker's house. As he walked towards the man at the plow I saw him waving his hands, making motions with them, and heard talking at the same time. The talking was in a loud tone of voice, loud enough for me to hear 200 yards, and appeared to be in an angry tone. When the man went to the horses' heads he was behind the horses from me. When the shots were fired he seemed to be about opposite the horses' bodies. I saw and heard but two shots, and when they were fired the man sank right down, and the man with the plow plowed right on off. He did not shoot after the other man fell. The man at the plow was north of the man who was

shot, and was between me and him at the time of the shooting. There was no shot fired after the man fell or sank down."

Andrew McDonald, a witness for the State, testified: "I heard somebody talking down there, and I looked and saw Mr. Parker going to the man who was plowing. He went up to the horses' heads, and then stepped back from them, and the man who was plowing shot twice, and Mr. Parker fell. Mr. Parker was standing up straight, facing the man with the plow, when the shots were fired, and was not leaning over; and as soon as the shots were fired I saw Mr. Parker sink down, and the other man plowed right on off and left him there. I was about 200 yards from where the shooting occurred, and about 200 yards east of Mr. James. I saw the smoke from the pistol and heard both shots. Mr. Parker was standing up straight, facing the other man when the shots were fired. The other man did not shoot Mr. Parker after he fell. There was no shot fired after Mr. Parker fell."

This witness flatly contradicts Matt James, J. J. McCorley, and the defendant on a number of immaterial points.

On the question of deceased being armed, Henry Buster and C. L. Mills, for the defense, testify, that they reached the body a few minutes after the shooting, and assisted in carrying deceased to the house and in pulling off the boots of deceased when the body had been carried to the house; that Parker's right pants-leg was in his boot, and that when the right boot was pulled off a butcher knife fell out of it; that the blade of the knife was eight or ten inches in length, and it appeared to have been freshly ground. That the knife was in the boot, and when the boot was pulled off it fell out of it; that the body was carried to the house in a hack, and the boots were pulled off before the body was taken out of the hack.

J. J. McCorley, a witness for the State, testified: "I know the tract of land on which Mr. Parker was killed. There is supposed to be twenty-four acres of it. I rented it from Mr. Parker for the year 1894. I was plowing on the land, preparing it for the crop of 1894, when Mr. Parker was killed. Mr. Parker's two grown sons were working with me, assisting me, when Mr. Parker was killed. We were plowing down near the southeast corner of the tract when defendant drove in on the land. None of us said anything to him about plowing the land. I did not see any part of the shooting. I saw Mr. Parker a few moments before the shooting occurred. He was going straight across the land from the east side to the west side, and from the direction of his house. A very short while after I saw Mr. Parker I heard two pistol shots; they were fired in rapid succession. I ran towards the place and soon came in view of the parties. Mr. Parker was lying in six or eight feet of the plowed ground, and defendant was plowing away from him, and was about thirty yards from where the

body was lying. I ran on up to where the body was lying. He was dead when I got to him. Parker's two sons were with me, and we passed defendant plowing south away from the body about forty yards from same. Mr. Buster and several others soon came, and we carried the body to the house. I have known Mr. Parker for several years, was living at his house at the time of the shooting, and had lived with him before this last time. I went back to Mississippi about two years ago, and came back out to Mr. Parker's the last time about the 1st of November, 1893, and rented the twenty-four acres of land to make a crop this year. I knew the land had been rented to defendant before I rented it, and heard of the arbitration after I rented it. Mr. Parker told me that he had rented the land to Harris, and Harris had rented it to Milrainey, but they thought Milrainey did not want it, and Harris let him have it back, and then he let me have it. The defendant came to me while I was cutting the stalks and preparing it to plow, and after I had worked about a day and a half on the land, and talked to me about having rented the land from Harris. This was a short while before the arbitration, about the first week in November, 1893. I never heard Parker make any threats against defendant. Heard him say on Sunday morning before he was killed on Monday, that if defendant came over to plow the land he would go and order him off, and if he didn't go he would then go and get an officer and have him put off. I also heard Parker say if defendant got the land he would get it at the end of a law suit."

With reference to the renting of the land, O. W. Jones, A. F. James, and Henry Buster testified, that they acted as arbitrators to decide, between A. B. Harris and Logan Milrainey, as to whether Milrainey was entitled to twenty-four acres of land for the crop year of 1894, which Harris had rented from Parker; that both of the parties made the same statement to them, and on their statements they decided that Milrainey was entitled to cultivate the land; that they didn't specify and describe any particular land, but simply rendered their decision in favor of defendant for twenty-four acres of land which Harris had rented from Parker; that Parker was not a party to the arbitration, and was not present; that they knew that Parker had rerented the land to McCorley at that time.

As to the character of the deceased, a number of witnesses both for the State and defense, all testified, that he was a good, honest, upright citizen; some that he was a quiet and peaceable citizen; some that he was quiet and peaceable when he wasn't mad; and all that he was a man who might be expected to put into execution any threat which he might make. These men had known deceased, in the neighborhood where he was killed, for eighteen years. A number of the same witnesses had known defendant for about three years in that neighbor-

hood, and all testified that he bore the reputation of being a quiet, peaceable, law-abiding young man.

The defendant's statement was contradicted on the following points, by the following witnesses: Defendant stated that John Shilling warned him to watch Parker; that he had cut a man all to pieces in Tennessee before he came to Texas. Shilling was called by the defendant, and on direct examination said he did not remember having made such a statement to defendant, and on cross-examination by the State, said he made no such statement.

A. B. Harris, called by the State, said that he heard a conversation between defendant and Parker at his lot some time about the 1st of November. Parker did not say to defendant during that conversation, "If you ever come on my land, you will do it at the peril of your life." There were no such words spoken by Parker. On cross-examination by defendant, he said: "I was down at the lot turning out my cow at the time of the conversation. I was not right with them during all the conversation. I was over at the other side of the lot, fifty or sixty feet away, part of the time, turning out the cow. I did not hear all that was said between them. Don't know all that was said. Don't know how long they talked. They were talking about the land. I am the same Harris that rented the land from Parker and subrented it to defendant. I am the same Harris that went before the arbitrators and agreed to abide by their decision. Defendant boarded at my house from about October 1, 1893, to November 8, 1893."

H. C. Bray, for the State, said: "I had a conversation with defendant, about the time he moved from Harris', about the land. He said to me, 'I will cultivate the land or lose my life.' I asked him what he wanted with a knife he had. He said, 'I got it to cultivate the land with.'" Cross-examined, he said: "I asked him what he was moving for. He said, 'Parker and Harris are trying to rule me out over there, and old man Parker has forbidden me going on my land at the peril of my life.' This was the day after the arbitration he told me this."

The evidence excluded by the ruling of the court complained of in the fifth assignment of error, and the circumstances under which it was excluded, are set out in defendant's bill of exception number 2, as follows: "The State introduced the witness A. B. Harris, in rebuttal of the defendant's testimony, and upon cross-examination of said witness, defendant offered to prove by said witness (who was shown to be the person from whom defendant rented the land) all of the facts testified to by defendant with reference to the terms of the rental contract between said Harris and deceased, and between the said witness Harris and defendant, concerning the land about which the fatal difficulty occurred, and which said facts were known only by defendant, deceased, and said Harris. And the State's counsel objected to the in-

troduction of said testimony, on the grounds that the said evidence was not in rebuttal of any evidence introduced by the State, and was original evidence, and the defense had closed except for rebuttal; and the court sustained said objection, and defendant excepted. And the defendant, by his counsel, then asked leave of the court to introduce the said testimony as original evidence, to which the State objected, and the court sustained the objection;" and the defendant saved his bill of exceptions in due form.

The thirteenth assignment of error is as follows: "The court erred in giving the twenty-fifth paragraph of its general charge to the jury, over the objections of defendant, as shown by defendant's bill of exception to the charge, for the reasons stated and specified in paragraph 3 of same."

The twenty-fourth paragraph of the charge of the court is as follows:

"When a party's own original act was in violation of law, then the law takes that fact into consideration in limiting his right of self-defense and resistance while in perpetration of such unlawful act. If he was engaged in the commission of a felony, and to prevent its commission the party seeing it, or about to be injured thereby, makes a violent assault upon him calculated to produce death or serious bodily injury, and in resisting such attack he slay his assailant, the law would impute the original wrong to the homicide, and make it murder. But if the original wrong was or would have been a misdemeanor, then the homicide growing out of or occasioned by it, though in self-defense from an assault made or about to be made upon him, would be manslaughter."

The twenty-fifth paragraph of the charge is as follows:

"If it appears from the evidence that the defendant provoked the difficulty with intent to take advantage of any hostile movement on the part of the said Parker, and intending then and there to kill him or do him serious bodily injury, and deceased under such provocation made an assault or demonstration, or did any act which indicated an intention to inflict an assault or assault and battery on defendant so slight as not to cause pain or bloodshed, and then the defendant with a deadly weapon, with intent then and there to kill him, made an assault upon said Parker, then defendant would be guilty of murder, although Parker may in fact have made the first assault or demonstration from which defendant might have reasonably inferred an intention to make such slight assault as not to indicate an intention to cause pain or bloodshed, or such an assault and battery as would not cause pain or bloodshed. On the other hand, if you believe the defendant provoked the difficulty without any intention of killing the said Parker or doing him serious bodily injury, and suddenly, without deliberation, the defendant made the assault charged, with a deadly weapon, and

thereby killed said Parker, then the offense would have been manslaughter."

The twenty-sixth and twenty-seventh paragraphs of the charge are as follows:

"26. If, from the evidence, you believe Parker was the real owner and in possession of the land on which the alleged killing took place, and he had rented the same to Harris, and that the latter had rented the land to defendant with the knowledge and consent of Parker, but after such renting to defendant, and before the alleged killing, the defendant relinquished, abandoned, and surrendered the land to Harris, and Harris had relinquished and abandoned it to Parker, then Parker would be reinvested with all the rights he had before he rented it to Harris in the first instance; and if you further believe that Parker had not rerented the same to any person, and that at the time of the alleged killing the defendant was upon the land without the consent of Parker, then he would be a trespasser, and Parker under such a state of facts would have the right to use all the reasonable and effective force necessary to eject defendant from the land, and if he used no more force than under the circumstances was reasonably necessary to eject him, and that defendant in resisting such ejection with a pistol, which you believe in the manner used was a deadly weapon, he shot and killed the said Parker, then the offense would be murder of the same degree.

"27. But if you believe there had been such a renting by Parker to Harris and by Harris to defendant, and such an abandonment and surrender of defendant's rights to the premises, and Parker's reinvestment of the title and possession of the land and premises as were referred to in the last preceding paragraph, and that if Parker had been reinvested with the right to rerent said land, and that prior to the alleged killing Parker had rented the land to McCorley, and he was then and there in possession of the same, using or cultivating the same, and if the evidence does not show any reservation by Parker which gave him the right to enter at will upon the rented premises during the time it was rented to McCorley (if rented to him at all) then (if the premises had been legally rented to McCorley) neither Parker nor defendant had any right to enter upon the premises. And if they met upon the premises under this state of facts, neither had the right to eject or interfere with the other. For the law is, if a tenant enters into the premises so rented, the landlord during the term parts' with all his right of control over the same, except to prevent permanent injury. He would have no more right to enter the premises than a stranger to the title, and if he did enter without license from the tenant he would be a trespasser."

*Moffett & Anderson* and *John B. Durrett* filed a very able and elaborate brief for appellant, the substance of which is condensed in their clos-

ing argument, as follows:   The record in this case clearly shows that the
fatal shots were fired by the defendant while deceased was in the ·act
of making a deadly assault upon him with the intention and the abil-
ity to take defendant's life; and there is no evidence tending to show
any act on the part of defendant reasonably calculated to provoke de-
·ceased to make such assault, or any intention on the part of defendant
to provoke deceased and bring on a difficulty with him for the purpose
of taking his life, and that upon this state of facts the defendant was
convicted of murder in the second degree and sentenced to fifteen
years' imprisonment.   The record further shows, that the court in its
instructions to the jury (over requested charges by the defendant and
his specific and strenuous exceptions to the general charge) ignored
the question as to whether the defendant was engaged in the conscious
protection and defense of his right to the possession of the disputed
premises (as his right to the same appeared to him upon reasonable
grounds at the time), against an unjust and unlawful invasion of said
right to the possession of said premises on the part of deceased, ac-
companied by an attempt on the part of deceased to kill defendant;
and in said charge limited defendant's right to defend his life, by a
technical question of civil law, to wit, whether defendant was legally
entitled to the possession of the disputed premises.

We submit to the court that the verdict of the jury is unsupported
by and contrary to the evidence; that the trial court erred in refusing
defendant's special charges, and in overruling defendant's exception
to the general charge; and in overruling defendant's motion for a new
trial; and we respectfully ask that the judgment of the District Court
be in all things reversed, and that said cause be remanded.

*R. L. Henry*, Assistant Attorney-General, for the State.

SIMKINS, JUDGE.—Appellant was convicted of murder in the sec-
ond degree, and his penalty assessed at fifteen years.

We think the court erred in refusing to permit the defense to prove
by the witness A. B. Harris the facts of the rental contract by which
appellant claimed possession of the land in dispute.   Appellant's right
to the said land was one of the principal grounds of the defense.   No
witness knew the facts of renting except appellant, Harris, and de-
ceased.   The appellant testified to them.   Harris was placed on the
stand to impeach appellant on a single matter.   Appellant sought to
corroborate all he had stated about the contract, but the court ruled
it out, because the defense had closed except in rebuttal, and also re-
fused to allow its introduction as original evidence.   When a matter
has been fully investigated, and testimony is again sought to be intro-
duced by one who has closed his side, leave to do so may be refused
by the court.   Still, the court should even then act cautiously in exclud-

ing offered testimony, especially in the graver crimes. But where, as in the case at bar, the only testimony as to the rental contract was appellant himself, and the court, by its charge, hinged appellant's guilt on his right to the land, it would seem that it was necessary to a due administration of justice to permit appellant to corroborate his own evidence by said witness. Code Crim. Proc., art. 661.

Again, we think the thirteenth assignment is well taken. The twenty-fourth and twenty-fifth paragraphs of the court's charge instructed the jury, in effect, that a person's own original act, when unlawful, limited his right of self-defense; and if he killed another in self-defense while engaged in a felony, it would be murder, but if engaged in a misdemeanor, it would be manslaughter. If the defendant provoked the difficulty with intent to kill Parker, and Parker, in consequence, made a slight assault on defendant, who thereupon killed him, it would be murder. If, however, defendant provoked the difficulty without intention of killing, yet, suddenly and without deliberation, killed Parker, it would be manslaughter. The last proposition is incorrect (Willson's Crim. Stats., art. 1024); but conceding it to be law, it is certainly difficult to see what connection either paragraph has with the case at bar. There is no evidence that appellant, at the time of the homicide, was engaged in a felony or misdemeanor, or that he provoked the difficulty either with or without an intent to kill. The uncontradicted testimony clearly shows that appellant was at the time of the difficulty upon his own land. He had rented it, and had made a peaceful entry thereon with his plow and team, and was engaged in working it. The evidence further shows that, armed with a butcher knife carried concealed in his right boot, the deceased went into the field where appellant was plowing, talking very loudly, and, as appellant states, ordering him to quit the field, or he would kill him, and was within five feet of appellant when he was killed; appellant shooting him three times, the first shot, as appellant states, being fired as the deceased was reaching in his right boot, saying: "I'll kill you; God damn you, I'll kill you." We presume the court must have charged the jury upon the theory that appellant's going upon the land was a provocation to the deceased. But surely one going in good faith to work upon his own premises could not be said to be provoking a quarrel, or engaged in a misdemeanor or felony, even though he may have had reason to believe that his presence on the land might be offensive to another. There was no evidence that appellant went on the land to taunt or provoke the deceased, for the purpose of killing, or any other purpose, as suggested by the charge; but the evidence clearly shows that the time had come, if ever, for appellant to have asserted his rights and hold to his possession, which the deceased, aided by Harris and McCorley, was trying to take from him. The charge was inapplicable and erroneous. Ball's case, 29 Texas Crim. App., 107.

The same objection lies to paragraphs 26 and 27 of the charge. They are predicated upon theories of the court that find no support from the evidence in the case. There is no testimony tending to show that appellant "relinquished, abandoned, and surrendered the land to Harris," who, in turn, released his right to Parker, who thereby was reinvested as owner with right to eject appellant when he trespassed on the land. Nor is there any testimony tending to show that the appellant after renting said land surrendered his rights in the same, and Parker, being reinvested with the right to rerent the land, had rented it to McCorley, who was in peaceable possession of the same. Nor is there any ground for the suggestion of the court that Parker had reserved the right to enter at will upon the land rented to McCorley. On the contrary, the evidence shows that appellant insisted on his rights; that he never abandoned his claim to Harris, Parker, or any one; but that, after making the contract with Harris, with the knowledge and consent of deceased, who was the owner, and after building a corn crib and moving his corn on the place, and arranging for board with Harris, Parker, the deceased, determined to get rid of appellant. Harris was induced to assist in the effort. The matter between appellant and Harris was then submitted to arbitrators, who decided appellant was entitled to the land. Notwithstanding this, Parker endeavored to dispossess appellant by renting the land in dispute to one McCorley, who knew appellant's rights in the premises. McCorley went upon the land and began to prepare it for cultivation, when appellant drove his plow and team on the land and began plowing it. Deceased then attempted to eject him. McCorley saw appellant plowing, but did not attempt to interfere or object. He did not witness the shooting, being prevented by an intervening rising ground.

The difficulty in giving charges of the character here discussed is, that they frequently operate, whether correctly or not, as suggestions to the jury of the views entertained by the court as to the defense in the case, and lead them to accept as true a theory which has no other foundation than judicial incredulity and suspicion.

But, while the charge of the court was voluminous and presented issues not raised by the testimony in the case, we think the court erred in not presenting the question of manslaughter in connection with appellant's right to the possession of the land. It was in this connection that he charged fully on self-defense, but he should have gone further and submitted manslaughter from the same standpoint. Even when it may not justify the taking of human life, an attack on one's property is justly regarded as a great provocation and constituting adequate cause. The determined conduct of deceased in seeking to drive appellant from the land in defiance of right and good faith was well calculated to arouse the passion and resentment of a person of ordinary

courage and spirit. Appellant was certainly entitled to a more specific charge on manslaughter than the statute.

We do not think the evidence supports the verdict. There are but three persons who witnessed and testify to the shooting, the appellant being one of them. The appellant states, that deceased came up to his horses, ordering him to get out in the road or he would kill him; that he caught the horses by the bits and pushed them to the road, repeating his threats; that he, appellant, thereupon pulled the horses back and told deceased to let them alone; and deceased stepped back from the horses' heads and reached down into his right boot-leg, with his left side towards appellant, exclaiming "I'll kill you; God damn you, I'll kill you;" and appellant drew his pistol and fired; that when appellant fired the last two shots deceased raised up straight and threw up his hands and staggered, etc. Appellant states he fired three shots. On the other hand, Matt James and Andrew McDonald, witnesses for the State, who claim to have witnessed the whole difficulty from different points 200 yards off, deny that deceased stooped down, but testify he was standing up facing appellant when the shots were fired, but that only two shots were fired by appellant, and none were fired after deceased fell. The physical facts tend strongly to corroborate appellant, and contradict or impair the statement of said witnesses that they saw the *whole* difficulty. The evidence clearly shows there were three bullet holes in the body of deceased—one below the right nipple, one below the left nipple, the third entering just above the left shoulder blade, ranging downward in the body and towards the backbone. The two last shots were fired in rapid succession, and it is probable that the witnesses saw the last two and not the first.

For the errors indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Judges all present and concurring.