## H. S. GRIFFIN v. THE STATE.

No. 9112.　Delivered May 20, 1925.

Rehearing denied State June 20, 1925.

1.—Murder—Charge of Court—On Duelling—Improperly Submitted.

When the only evidence of a duel, was a remark made by the witness Rayburn to the appellant, after the homicide, being a question as to where he and deceased agreed to meet and fight this "duel" it was error for the court to submit the law of duelling, as it is contained in Arts. 1145 and 1146 of our penal code.

2.—Same—Continued.

None of the essential elements of a duel were raised in the evidence in the case. It was conceded by both the state and the appellant that the meeting of deceased and appellant at the place of the homicide was brought about by a controversy between them over a fence that deceased insisted he would build, on land claimed by appellant. Both were armed, and while the controversy and meeting which resulted in the killing may have raised the issue of mutual combat, we are clear that a charge on duelling was erroneous to the extent that the cause must be reversed.

3.—Same—Requested Charge—On Defense of Property—Erroneously Refused.

While appellant predicated his defense upon the law of self-defense, he also testified to the effect that he had armed himself and had gone to a fence line, prepared to prevent deceased by force of arms from invading his land and dispossessing him, and together with other evidence, and the antecedent controversy over the fence line, raised the issue of a killing in the defense of property, and it was error to refuse appellant's special charges presenting such issue. See authorities cited in opinion.

Appeal from the District Court of Young County. Tried below before the Hon. H. R. Wilson, Judge.

Appeal from a conviction of murder; penalty, twenty-five years in the penitentiary.

The opinion states the case.

*Weldon & McDonald, Marshall & King, Weeks, Morrow, Frances & Hankerson,* for appellant.

100 Tex. Crim.—41.

*Jas. V. Allred,* District Attorney; *D. A. Frank; Ballington, Boone & Humphrey,* and *Jno. B. King, Tom Garrard,* State's Attorney, and *Grover C. Morris,* Assistant State's Attorney, for the State.

HAWKINS, JUDGE.—Defendant is under conviction for murder resulting from the killing of Hugh Riley, Jr. The punishment is confinement in the penitentiary for twenty-five years.

Defendant (Griffin) and Hugh Riley, Sr. had purchased considerable land together in Archer County. Riley, Sr. had conveyed his interest to his two sons, Hugh Riley, Jr. (deceased) and Ed. Riley. A partition had taken place between them and Griffin. In this partition a note for some thirty thousand dollars had been executed in favor of Griffin. Suit was instituted on this note. The case was tried and appealed. A controversy relative to the location of à land line had arisen between defendant and deceased. They had gone to Dallas some two weeks prior to the homicide to see the attorney representing deceased, seeking to settle all the controversies between them, including the land line. The attorney was expected in Archer County about June 1st to try to adjust matters. The homicide occurred May 16th. On the morning of the killing, defendant learned that deceased was having a fence built on land claimed by defendant. About noon he saw deceased in the town of Dundee and protested against building the fence. Deceased stated that he intended to complete the fence, whereupon defendant told him that he (defendant) would be at the place where the fence was being built and asked deceased when he would be there. There is disagreement in the testimony as to the exact language used by each of them, but there is no dispute that both said they would be there in the afternoon. After dinner defendant went to where two men (employees of deceased) were building the fence, and requested them to stop, telling them there was a dispute about the line. They quit work. Defendant came back across the river, as he explains, to watch and see if the fencers undertook to resume fencing. The State claims his purpose was to lie in wait for deceased. It is not disputed that defendant had told deceased to stay on his own land. Defendant says that in view of this request he expected deceased to approach on a different route from the one he did come. Deceased stopped his car near the corner of his and defendant's land, and went down a fence line not in dispute, and on the inside of deceased's field. Defendant claims that deceased stopped his car because he saw defendant, while the State claims he did so in compliance with his custom. The body of deceased was near the fence but on his own land about six hundred feet from the point where he stopped his car. Defendant claims that deceased got out of his car with a shotgun and rifle, both of which, together with some cartridges, were found near his body. The State

claims he was unarmed at the time of the shooting; that the guns and cartridges were taken out of deceased's car after the shooting by defendant and "planted" by him near the body for defensive purposes. It is admitted by defendant that he drove his car down the bluff, and drove under the bluff to a point opposite where deceased was shot, where defendant left his car and came up near the top of the bluff. Defendant claims to have done this because he feared deceased would shoot when the latter got out of the car with his two guns. The State claims defendant did this to seek a vantage point in order to shoot deceased from ambush. It was some two hundred and sixty feet from the point under the bluff where defendant stood when he fired to the body of deceased. He was shot one time with a Winchester rifle. Defendant claim to have told deceased that he (defendant) had stopped the fence builders, and requested deceased to await the coming of his lawyer, but that deceased, instead of agreeing to this, expressed his intention of coming through the fence; that he dropped his shotgun against the fence and presented his rifle as if to shoot and did shoot about the same time defendant fired. The point of the killing was a half mile from where the fence was being constructed, and across the river from it. The land in dispute was claimed by defendant, had been in his possession, and used by him for a number of years.

The court charged the jury that if they found from the evidence beyond a reasonable doubt that defendant, acting with malice aforethought, not in self-defense or not under circumstances which would reduce the offense to manslaughter, shot and killed deceased they would find him guilty of murder. Immediately following this instruction appears paragraph five of the charge which is as follows:

"A duel is a combat or fight engaged in by two persons with deadly weapons by agreement or prearrangement. Any person who wounds another in a duel from which such wounded person dies within three months thereafter, is guilty of murder. If you find and believe from the evidence beyond a reasonable doubt that the defendant, H. S. Griffin, and the deceased, Hugh Reilly, Jr. engaged in a combat or fight with deadly weapons by agreement or prearrangement and that in such combat, if any, the defendant wounded the said Hugh Reilly, Jr. from wound the said Hugh Reilly, Jr. died within three months thereafter, then you will find the defendant guilty of murder  and assess his punishment at death or by confinement in the state penitentiary for life or for any term of years not less than five."

This charge was based upon Article 1146 of our Penal Code. We quote here Articles 1145 and 1145; they read:

"Any person who shall, within this state, fight a duel with deadly weapons, or send or accept a challenge to fight a duel with deadly weapons, either within the state or out of it, or who shall act as a

second, or knowingly aid or assist in any manner those thus offending, shall be deemed guilty of a felony, and, upon conviction, shall be punished by confinement in the penitentiary not less than two nor more than five years.''

''If, in any duel hereafter fought in this state, either of the combatants be killed, or receive a wound from which he afterwards dies within three months, the survivor shall be deemed guilty of murder in the first degree and be punished accordingly.''

The instruction on duelling was objected to for various reasons, principally, (a) because the indictment did not charge duelling, hence the instruction was inapplicable; (b) because the charge did not clearly define the offense of duelling, and (c) because the evidence did not raise such issue. These objections raise legal questions not free from difficulty. One of them, arising in different form, was considered in Johnson v. State, 263 S. W. Rep. 924. While it would be interesting to examine into these matters, we think it not necessary to do so. Regardless of the other points, in our opinion, the one challenging the sufficiency of the evidence to raise the issue must be sustained.

We are not called upon to trace the history of the anti-duelling clauses in the Constitution and statutes of our State, nor the changes which have been made in the law and in the penalties until we find it reflected in its present form in Articles 1145 and 1146 (supra). It is well understood that the purpose of our Constitution and statutes regarding the matter was to discourage and discountenance the settlement of real or imaginary grievances (usually for reflections, real or apparent, upon one's honor) by resorting to the old *code duello*. What that was is very clearly set out in Ward v. Commonwealth, a Kentucky case reported in 116 S. W. Rep. 786. We quote:

''It is not necessary for the purposes of this case to enter into an elaborate definition of the word 'duel'. For our purposes a duel is a combat with deadly weapons, fought according to the terms of a precedent agreement and under certain agreed or prescribed rules A duel has none of the elements of sudden heat and passion. On the contrary, it is a combat, fought in cold blood, and under rules prescribing the utmost formality and decorum. One of the strongest arguments in favor of the duelling system was the fact that it tended to eliminate sudden and bloody encounters between angry combatants; that the code of necessity gave time for passion to subside and sober reason to return; that it gave opportunity for the intervention of friends, and it was said that this of itself operated to prevent bloodshed. Whether this argument was sound or unsound is immaterial now. We know from the history of the age just gone that the code duello, as practiced by our fathers, was a formal and decorous system, the requirements of which were carried out with the most punctilious formality. There was something highly .

romantic in the system, and there is no gainsaying that it held a
high place in the estimation of the past age. It was to abolish this
barbarous practice that the anti-duelling statute and the con-
stitutional provisions were enacted."

See Ruling Case Law, Vol. 1, Sec. 377; Wharton's Crim. Law,
11th Ed., Vol. 3, Secs. 2115 to 2123; Corpus Juris, Vol. 19, pages
825 to 832. That the "duel" had in mind by the framers of our
Constitution and members of the Legislature was the combat arranged
with some formality, and usually through the medium of friends
acting as seconds, is clear from the fact that not only are the prin-
cipals denounced, but those who act as seconds, or who assist in any
manner.

Unless the testimony of Burkett, Morgan and Rayburn raise the
issue of "duel" it is not in this case. Burkett was the barber in
whose shop the parties met about noon. His evidence may be thus
condensed: When defendant came in witness was shaving deceased.
Some words of pleasantry passed between the parties. No ill feel-
ing was manifested then. Defendant waited until deceased was
shaved and they then commenced a discussion about the fence.
Defendant claimed it was not being built on the correct line but that
deceased was taking one hundred and sixty acres of defendant's land.
Deceased claimed that he was having the fence put on the correct
line. Defendant drew a plat on the floor and they discussed the line
in connection with it. Defendant asked deceased where he would
be in the afternoon. Deceased said he would be down where the
men were fencing about one-thirty o'clock. Defendant said he
would also be there and was going to stop the men from fencing;
he appeared to be angry, and told deceased to stay on his own land.
No threats were heard by this witness. The parties walked out of
the barber shop and down the side-walk together towards the bank.
Some further conversation was had between them in front of the
bank, part of which the witness Morgan heard. He testified that
deceased said he had no doubt the surveyor was correct about the
line; that defendant said he was not going to allow the fence to
be built there; that defendant asked what time deceased would be
down there to which he replied about two o'clock; that defendant
told deceased he had better come prepared, to which deceased replied;
"You can't bluff me, you tried that before." From the tone of the
voices witness did not think the men were very angry. After de-
fendant left deceased came in the bank laughing. Witness heard
nothing said about "guns" or "killing". After the shooting de-
fendant came to the town of Dundee, told Morgan to telephone the
sheriff, and requested Rayburn to accompany him. Rayburn testifies
to a conversation had with defendant on the way back to the scene
of the killing. According to witness, defendant said he and deceased
had agreed to meet and settle the matter,—or thing,—and were to

come prepared; that each of them had two guns; that each shot once; that defendant said when he went into the thing he made up his mind not to get excited but had gotten "rattled"; that he had a large amount of life insurance and felt if he lost he would gain, but never felt he would lose; that deceased did not know what a good shot defendant was, nor that he did not know what kind of a shot deceased was. Witness then says: "I asked Herbert (defendant) where he and Hugh (deceased) agreed to meet and fight this *duel*," and he says: "Right on the fence line where I shot him"; that defendant said no words passed between them, but as defendant came up the bluff deceased was standing there; that both dropped to their knees and fired. Witness testified that defendant .did not say he and deceased had an agreement to meet and shoot it out, nor did defendant say what it was they were to settle, nor how they were to come prepared, nor that the agreement was that each should bring two guns, but only stated that each had two guns. Witness further testifying said:

"He (defendant) did not say whether he had made an agreement as to how they were to knew when they were ready, or the position each was to take, or what kinds of guns they were to use. . . . In all my talk that day with defendant, I was the only one that used the word "duel" that I remember."

Apparently the idea of "duel" dropped into the case by the use of that word by the witness Rayburn. The evidence just recited hints at trouble which might arise upon the meeting of the parties in the vicinity of the fence-building operations, and veiled threats in the suggestion of defendant to deceased that he had better come "prepared". That deceased so understood it is shown by his reply heard by Morgan when he told defendant that his "bluff" was ineffective. The evidence may raise the issue of "mutual combat" as a limitation upon defendant's claim ·of self-defense, and if this issue had been submitted, we would have an entirely different ques- tion. The principles controlling where the issue of mutual combat arises are illustrated by many cases from our own court (See Habel v. State, 28 Texas Crim. App. 588; 13 S. W. 1001; Anthony v. State, 62 Texas Crim. Rep. 138; 136 S. W. 1097. Other authorities may be found collated under Secs. 1960, 1961, 1962, Branch's Ahn. Texas P. C.) The facts do not raise the issue of duelling. The charge upon that subject should have been omitted. That it was injurious is patent.

The court gave- no charge upon the defense of property. Proper objection was made because of such omission, and several special charges upon the subject were requested and refused. Defendant insists that the issue was in the case. The State with equal earnest- ness contends otherwise. The point where the fence was being con- structed was north of the Witchita River. The killing occurred

south of the river some half mile from the disputed fence, but on a bluff overlooking the river valley from which the posts in the new fence could be seen. There was no dispute about the fence at which the killing occurred, but if deceased had come through that fence, he would have been on defendant's land and would have traveled on defendant's land from that point to the place where the disputed fence was under construction. The property under dispute had been in possession of defendant for several years. In February prior to the killing in May, deceased had started some hands to "grubbing" on this land. Defendant protested to deceased and the work ceased. It appears that deceased then employed the County Surveyor who fixed the line at a point on property in defendant's possession. Deceased started fencers to work, telling them he was in a hurry to have the fence built. From the conversation between defendant and deceased in the morning, it was understood that both of them were to be at the place where the fence was being constructed, in the afternoon. According to defendant, the deceased had expressed an intention of proceeding with the work on the fence regardless of defendant's protest, and when defendant had said he was going to stop builders deceased had said: "If you stop them I will stop you." Defendant had stopped the hands from working on the fence, and they in fact had come back to the south side of the river to a tenant house on deceased's land and were waiting there to see him about the fence building, but the record does not show that either defendant or deceased knew where they were. At the time deceased arrived defendant says he was watching to see if the hands were going to resume work on the fence. As we understand the record, the State does not question but that deceased was on his way to the place where the fence was being built, nor that defendant had told him in going there to stay on his own land. If the issue of defense of property was raised, it must necessarily depend upon the testimony of the defendant viewed in the light of the matters already related leading up to the killing. His testimony on direct examination was in substance that deceased apparently intended to proceed in his car across defendant's land to the river which would have taken him to a point near the disputed fence, but that upon seeing defendant, deceased backed his car to a point on deceased's land, got out with a Winchester rifle and shotgun, and started east along a fence which at that point separated the lands of the parties; that defendant traveled under the river bluff a route paralleling that of deceased, and came up the bluff to see what deceased was doing; that the latter had started through the fence and defendant told him not to come through, and also told him that he (defendant) had stopped the fencers, and for him to wait for his lawyer and lets settle their differences in court; that deceased said: "The courts are too slow and damn you and the courts too"; that deceased dropped his shot-

gun and raised his rifle like he was going to shoot; that defendant then got his rifle and that both shot about the same time. We take excerpts from his testimony on cross-examination:

"I didn't want him to take possession of the land away from me. . . . I thought if he fenced it it would take my rights away. . . . I said, 'don't you come through, you go on back and let this be settled, and if you are going to do anything, go to court and settle it', that he could not take my land away with his guns and he need not try to do anything like that, and he says, 'to hell with you and the courts too', and started to shoot me. . . . I don't know that he was actually hunting me, but he told me that he was going to fence my land, and I was going to see that he didn't. As to whether I shot him to keep him from it, will say that is the reason I was down there. Well, at the time I shot I didn't shoot to keep him from fencing it, but I would have shot him to keep him from it. . . . I would not have killed him if he had gone over where the fence posts were, but I figured if he was going to build the fence I was going to shoot him and keep him from it. . . . I was going to prevent him from fencing my land. . . . I wanted to stop him from going over where they were fencing. . . . I knew he was coming down there to try and fence the land or kill me. . . . That was the nearest way he could get to it, by cutting across the river. . . . I figured he was coming to fence that land and through force if necessary; I thought he would shoot me if it took that to fence it."

As the matter is presented by the defensive evidence, deceased had already made an unwarranted entry on land in defendant's possession and through employees of deceased was proceeding to construct a fence and take possession of defendant's land. Deceased had refused to discontinue the fence building but on the other hand expressed a determination to go on with it, making a threat against defendant in the event of the latter's interference. Deceased, apparently in pursuance of this intention, was engaged in an effort to make an unlawful trespass by force of arms upon the property of defendant for the purpose of going to and directing the further construction of the fence, or the resumption of its construction, and with the intention of effecting that purpose at all hazards and by the use of arms. For the rights and limitations of a party resisting a trespass by force of arms, we refer to Ross v. State, 10 Texas Crim. App. 455; McGlothlin v. State, 53 S. W. Rep. 869; Milrainey v. State, 28 S. W. Rep. 537; 33 Texas Crim. Rep. 577; Humphrey v. State, 165 S. W. Rep. 589; Mack v. State, 263 S. W. Rep. 912. Under our statute (Art. 1107, P. C.) before a person can justify a killing in the protection of property all other means then available to him must be resorted to. For the construction placed upon this article by the courts, in addition to the cases just cited, we refer to Lilly v. State, 20 Texas

Crim. App. 1; Woodring v. State, 33 Texas Crim. Rep. 26, 24 S. W. Rep. 293; Wilson v. State, 36 S. W. Rep. 587; Sims v. State, 36 S. W. Rep. 256, 36 Texas Crim. Rep. 154; Ledbetter v. State, 9 S. W. Rep. 60; Pryse v. State, 113 S. W. Rep. 938. Under the peculiar facts of the present case, we are inclined to the view that upon another trial this issue should be submitted under appropriate instructions.

Some criticism is addressed to the charge in other particulars than those discussed, but the matters complained of will not likely occur upon another rial.

The judgment is reversed and the cause remanded.

Morrow, P. J., not sitting.

*Reversed and remanded.*

ON MOTION FOR REHEARING.

LATTIMORE, JUDGE.—I am in thorough accord with my Brethren on the proposition that this case should be reversed because of the error of the court below in giving to the jury a charge on dueling, but owing to press of work and limited time I have not had opportunity to satisfy myself as to the correctness of the opinion in regard to the supposed error of the court in declining to give a charge on defense of property. The appellant being in jail, and there being some probability that the case may be tried, I am unwilling to hold the case in suspense until next term in order to thoroughly investigate and satisfy myself upon this question. The other matters raised in the State's motion for rehearing, in my opinion, do not merit the granting of said motion, which is therefore overruled, with the reservation that I may write later upon the question raised and the action of the court in declining to give a charge on defense of property.

The State's motion for rehearing is overruled.

*Overruled.*